Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 289-7319
Facsimile: (202) 898-0059

Counsel for *Amici Curiae*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JEFFREY M. MULLER; *et al.*, | : |
| | : |
| Plaintiffs, | : **No. 2: 10-CV-6110 (WHW) (CCC)** |
| v. | : |
| | : **Hon. William H. Walls** |
| THE HON. PHILIP J. MAENZA; *et al.*, | : |
| | : **Return Date:  February 22, 2011** |
| Defendants. | : |
| | : |
| | : **Application of *Amici Curiae*** |
| | : **Brady Center to Prevent Gun** |
| | : **Violence, Ceasefire NJ, and** |
| | : **New Jersey Million** |
| | : **Mom March Chapters of the Brady** |
| | : **Campaign to Prevent Gun Violence** |
| | : **to File an Amicus Brief** |
| | : **in Support of Defendants** |
| | : |
| | : |

Through undersigned counsel, the Brady Center to Prevent Gun Violence, Ceasefire NJ, and New Jersey Million Mom March Chapters of the Brady Campaign to Prevent Gun Violence apply to the Court for leave to file a brief as *amici curiae* in this case for the facts and reasons stated below.  The proposed brief is attached hereto as Exhibit A for the convenience of the Court and counsel.

The Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws, including cases involving public carry regulations. *See, e.g., McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010); *United States v. Hayes*, 129 S. Ct. 1079, 1087 (2009) (citing amicus brief of Brady Center to Prevent Gun Violence); *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); *Bateman v. Perdue*, No. 5:10-CV-265-H (D.N.C. Jan. 20, 2011) (order granting application as "timely and useful").

Ceasefire NJ, a project of the Coalition for Peace Action of Princeton, New Jersey, is the state's oldest organization devoted to reducing gun violence. Ceasefire NJ has written and promoted the majority of gun legislation enacted in New Jersey over the past twenty-five years.

New Jersey Million Mom March Chapters of the Brady Campaign to Prevent Gun Violence are part of a nationwide network of local volunteer activists of the Brady Campaign to Prevent Gun Violence. Chapters work throughout the state on federal and state legislation and elections, education and awareness campaigns, linking with victims, and coalition building and community outreach.

District courts have inherent power to grant third parties leave to file briefs as *amici curiae*, particularly if they "deem[] the proffered information timely and useful." *Yip v. Pagano*, 606 F. Supp. 1566, 1568 (D.N.J. 1985), *aff'd*, 782 F.2d 1033 (3d Cir. 1986) (internal quotations omitted). Here, *amici* bring a broad and deep perspective to the issues raised by this case and has a compelling interest in the federal courts' interpretation of Second Amendment issues. *Amici* thus respectfully submit the attached brief to assist the Court with the constitutional issues in this case, including important matters of first impression under the Second Amendment.

The proposed brief provides an overview of recent and longstanding Supreme Court Second Amendment jurisprudence, the policy implications of recognizing a right to carry firearms in public, and addresses an open question that has resulted from this jurisprudence— namely, what the appropriate standard of review for Second Amendment claims should be, and

shows how lower courts have answered that question thus far.  The brief also discusses the emerging trend in lower courts towards using a two-pronged approach to Second Amendment claims that asks (1) whether the law or regulation at issue implicates protected Second Amendment activity, and if so, (2) whether it passes the appropriate standard of review.  The brief then applies this two-pronged approach to Second Amendment issues in the case at hand, employing case law, sociological data, and legal commentary to place the permitting process of N.J. Stat. § 2C:58-4 and N.J. Admin. Code §§ 13:54-2.3, 2.4, 2.5, and 2.7 in the larger context of Second Amendment issues.  The brief concludes that (1) New Jersey's weapons permitting process does not implicate protected Second Amendment because the Supreme Court has only recognized a Second Amendment right to possess and carry guns in the home, and (2) that even if the permitting process did implicate protected Second Amendment activity, it would survive the appropriate level of review – the reasonable regulation test that over forty states have adopted – because it is a valid exercise of the state's police powers to enact legislation designed to protect public safety.  *Amici*, therefore, respectfully submit the attached brief to assist the Court in deciding the complex and significant issues raised in this matter.

Dated: January 26, 2011            Respectfully submitted,

s/Peter R. Bisio
Peter R. Bisio
Adam K. Levin
S. Chartey Quarcoo
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail:  peter.bisio@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

Counsel for *Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2010, I filed this Application of *Amici Curiae* Brady Center to Prevent Gun Violence, Ceasefire NJ, and New Jersey Million Mom March Chapters of the Brady Campaign to Prevent Gun Violence to File an Amicus Brief in Support of Defendants through the Court's CF/ECF system, which will electronically serve this document on both Plaintiffs' and Defendants' attorneys as follows:

David Douglas Jensen
Duane Morris LLP
744 Broad Street, Suite 1200
Newark, NJ 07102
ddjensen@duanemorris.com

Robert P. Firriolo
Duane Morris LLP
1540 Broadway
New York, NY 10036
rpfirriolo@duanemorris.com

Gregory A. Spellmeyer
Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
gregory.spellmeyer@dol.lps.state.nj.us


s/Peter R. Bisio
Peter R. Bisio

# EXHIBIT A

Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 289-7319
Facsimile: (202) 898-0059

Counsel for *Amici Curiae*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**


| | |
|---|---|
| JEFFREY M. MULLER; *et al.*,<br><br>              Plaintiffs,<br>       v.<br><br>THE HON. PHILIP J. MAENZA; *et al.*,<br><br>              Defendants. | :<br>:<br>:  **No. 2: 10-CV-6110 (WHW) (CCC)**<br>:<br>:  **Hon. William H. Walls**<br>:<br>:  **Return Date:  February 22, 2011**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |


**BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT
GUN VIOLENCE, CEASEFIRE NJ, AND NEW JERSEY MILLION
MOM MARCH CHAPTERS OF THE BRADY CAMPAIGN TO PREVENT
<u>GUN VIOLENCE IN SUPPORT OF DEFENDANTS</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

INTEREST OF *AMICI* ................................................................................. 3

LEGAL BACKGROUND ................................................................................ 3

ARGUMENT .................................................................................................... 6

I.     THE PERMITTING PROCESS IN N.J. STAT. § 2C:58-4 AND N.J. ADMIN. CODE §§ 13:54-2.3, 2.4, 2.5, AND 2.7 DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY ............. 6

     A.     The Public Carry Permitting Process at Issue Here Does Not Implicate Protected Second Amendment Activity Because it Does Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*. ........................................ 6

     B.     The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public. ........................................................ 12

II.     EVEN IF THE PUBLIC CARRY PERMITTING PROCESS IN N.J. STAT. § 2C:58-4 AND N.J. ADMIN. CODE §§ 13:54-2.3, 2.4, 2.5., AND 2.7 DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY ................................................................... 14

     A.     The Reasonable Regulation Test is the Appropriate Standard of Review. .......................................................................... 15

          1.     Licensing officers should be afforded an appropriate amount of discretion in enforcing firearm regulations. .......... 18

          2.     Given the governmental interest in protecting the public from the harms associated with firearms, deference to legislative directives is appropriate. ......................... 19

     B.     The Carry Permitting Process at Issue Is Constitutionally Permissible. ........................................................................ 22

CONCLUSION ............................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Avant Indus. Ltd. v. Kelly*,
    318 A.2d 47 (N.J. Super. Ct. App. Div. 1974)...........................................................................18

*Aymette v. State*,
    21 Tenn. 154 (1840)...........................................................................10

*Bleiler v. Chief, Dover Police Dep't*,
    927 A.2d 1216 (N.H. 2007) ...........................................................................16, 17

*Bliss v. Commonwealth*,
    12 Ky. 90 (1822)...........................................................................11

*Commonwealth v. Robinson*,
    600 A.2d 957 (1991)...........................................................................13

*Commonwealth v. Romero*,
    673 A.2d 374 (1996)...........................................................................13

*Dep't of Revenue of Ky. v. Davis*,
    553 U.S. 328 (2008)...........................................................................20

*District of Columbia v. Heller*
    128 S. Ct. 2783 (2008) ........................................................................... passim

*Dorr v. Weber*,
    2010 WL 1976743 (N.D. Iowa May 18, 2010)...........................................................................9

*English v. State*,
    35 Tex. 473 (1871)...........................................................................10

*Ex parte Thomas*,
    97 P. 260 (Okla. 1908)...........................................................................10

*Fife v. State*,
    31 Ark. 455 (1876)...........................................................................10

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)...........................................................................20, 23

*Gonzalez v. Village of West Milwaukee*,
    2010 WL 1904977 (E.D. Wis. May 11, 2010)...........................................................................9

*Harman v. Pollock*,
    586 F.3d 1254 (10th Cir. 2009) ...................................................................................18

*Heller v. District of Columbia*
    ("*Heller II*"), 698 F. Supp. 2d 179 (D.D.C. 2010) ........................................... passim

*Hill v. State*,
    53 Ga. 472 (1874) ......................................................................................................10

*Hopewell Baptist Church of Newark, NJ v. Gary*,
    266 A.2d 593 (N.J. Super. Ct. App. Div. 1970) ........................................................21

*In re Bastiani*,
    881 N.Y.S.2d 591 (2008) ...........................................................................................10

*In re Borinsky*,
    830 A.2d 507 (N.J. Super. Ct. App. Div. 2003) ........................................................20

*In re Dubov*,
    981 A.2d 87 (N.J. Super. Ct. App. Div. 2009) .............................................................8

*In re Echevarria*,
    2010 WL 4028108 (N.J. Super. Ct. App. Div. Aug. 20, 2010) ..............................1, 8

*In re Factor*,
    2010 WL 1753307 (N.J. Super. Ct. App. Div. Apr. 21, 2010) ...............................1, 8

*In re Novello*,
    2010 WL 2795030 (N.J. Super. Ct. App. Div. July 15, 2010) ................................1, 8

*In re Preis*,
    573 A.2d 148 (N.J. 1990) .............................................................................7, 10, 19, 21

*Jackson v. State*,
    68 So.2d 850 (Ala. Ct. App. 1953) .......................................................................16, 17

*Kelley v. Johnson*,
    425 U.S. 238 (1976) ...................................................................................................20

*Kennedy v. Louisiana*,
    128 S. Ct. 2641 (2008) ...............................................................................................15

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...................................................................................................15

*McCandless v. Beyer*,
    835 F.2d 58 (3d Cir. 1987) .........................................................................................13

*McDonald v. City of Chicago*
130 S. Ct. 3020 (2010) ...........................................................................................1

*People v. Dawson*, 2010 WL 3290998 (Ill. App. Ct. Aug. 18, 2010)........................................ 8-9

*People v. Flores*, 169 Cal. App. 4th 568 (2008) ...................................................................23

*People v. Yarbrough*,
169 Cal.App.4th 303 (2008) ...................................................................................12

*Planned Parenthood v. Casey*,
505 U.S. 833 (1992)................................................................................................15

*Queenside Hills Realty Co. v. Saxl*,
328 U.S. 80 (1946) ..................................................................................................20

*Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)................................................................................................21

*Riddick v. United States*,
995 A.2d 212 (D.C. 2010) ......................................................................................10

*Robertson v. Baldwin*,
165 U.S. 275, 281-82 (1897) ...........................................................................1-2, 10

*Robertson v. City & County of Denver*,
874 P.2d 325 (Colo. 1994)..................................................................................16, 17

*Siccardi v. State*,
284 A.2d 533 (N.J. 1971)..................................................................................10, 21

*Sims v. United States*,
963 A.2d 147 (D.C. 2008) ........................................................................................9

*State v. Buzzard*,
4 Ark. 18 (1842)......................................................................................................11

*State v. Cole*,
665 N.W. 2d 328 (Wis. 2003)............................................................................16, 22

*State v. Comeau*,
448 N.W.2d 595 (Neb. 1989)..................................................................................16

*State v. Dawson*,
159 S.E.2d 1 (N.C. 1968).........................................................................................17

*State v. Hamdan*,
665 N.W.2d 785 (Wis. 2002)..................................................................................16

*State v. Ingram*,
   488 A.2d 545 (N.J. 1985).....................................................................................7, 13

*State v. Jumel*,
   13 La. Ann. 399 (1858)..............................................................................................11

*State v. Knight*,
   218 P.3d 1177 (Kan. Ct. App. 2009) .........................................................................9

*State v. Sieyes*,
   225 P.3d 995 (Wash. 2010)........................................................................................23

*State v. Workman*,
   35 W. Va. 367 (1891) .................................................................................................10

*Teng v. Town of Kensingson*,
   2010 WL 596526 (D. N.H. Feb. 17, 2010) ...............................................................9

*Terry v. Ohio*,
   392 U.S. 1 (1968).......................................................................................................15

*Trinen v. City of Denver*,
   53 P.3d 754 (Colo. Ct. App. 2002) ...........................................................................16

*Turner Broad. Sys., Inc. v. FCC*,
   520 U.S. 180 (1997)...................................................................................................21

*United States v. Bledsoe*,
   2008 WL 3538717 (W.D. Tex. 2008)...................................................................17, 23

*United States v. Engstrum*,
   609 F. Supp. 2d 1227 (D. Utah)................................................................................23

*United States v. Hart*,
   2010 WL 2990001 (D. Mass. July 30, 2010).............................................................9

*United States v. Hayes*,
   129 S. Ct. 1079 (2009)................................................................................................4

*United States v. Marzzarella*,
   --- F.3d ---, 2010 WL 2947233 (3d Cir. 2010) ..............................................5, 17, 23

*United States v. Masciandaro*,
   648 F. Supp. 2d 779 (E.D. Va. 2009) .......................................................................23

*United States v. McCane*,
   573 F.3d 1037 (10th Cir. 2009) ................................................................................23

*United States v. Miller,*
    604 F. Supp. 2d 1162 (W.D. Tenn. 2009)....................................................................17, 21, 23

*United States v. Radencich*, 2009 WL 127648 (N.D. Ind. Jan. 20, 2009) ....................................23

*United States v. Schultz*, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009) ...........................................23

*United States v. Skoien*, --- F.3d ---, 2010 WL 2735747 (7th Cir. 2010) .................................5

*United States v. Tooley,*
    2010 WL 2380878 (S.D.W.Va. June 14, 2010)...............................................................10

*United States v. Walker,*
    380 A.2d 1388 (D.C. 1977) .................................................................................12

*United States v. Yanez-Vasquez,*
    2010 WL 411112 (D. Kan. Jan. 28, 2010) ...............................................................17, 23

*Williams v. State,*
    --- A.3d. ----, 2011 WL 13746 (Md. Jan. 5, 2011)................................................9

*Young v. American Mini Theatres, Inc.,*
    427 U.S 50 (1976).............................................................................................21

## STATUTES

Ark. Act of Apr. 1, 1881 ......................................................................................10

Conn. Gen. Stat. § 29-28 ....................................................................................19

Conn. Gen. Stat. § 29-29 ....................................................................................20

Conn. Gen. Stat. § 29-30 ....................................................................................20

Conn. Gen. Stat. § 29-32 ....................................................................................20

Conn. Gen. Stat. § 29-32a ..................................................................................20

Conn. Gen. Stat. § 29-32b ..................................................................................20

Conn. Gen. Stat. § 29-35 ....................................................................................20

Conn. Gen. Stat. § 29-37 ....................................................................................20

Haw. Rev. Stat. § 134-9 .....................................................................................19

Ky. Const. of 1850, art. XIII, § 25 ........................................................................11

Mass. Gen. Laws ch. 140, § 131 ...................................................................................20

Mass. Gen. Laws ch. 140, § 131C .................................................................................20

Mass. Gen. Laws ch. 140, § 131P, ch. 269, § 10 ..........................................................20

N.J. Admin. Code § 13:54-2.3 ............................................................................... passim

N.J. Admin. Code § 13:54-2.4 ............................................................................... passim

N.J. Admin. Code § 13:54-2.5 ............................................................................... passim

N.J. Admin. Code § 13:54-2.7 ............................................................................... passim

N.J. Stat. § 2C:39-2b ....................................................................................................13

N.J. Stat. § 2C:58-4 ............................................................................................... passim

N.J. Stat. § 2C:58-4(e) ..................................................................................................22

N.Y. Penal Law § 265.01 ..............................................................................................20

N.Y. Penal Law § 265.20 ..............................................................................................20

N.Y. Penal Law § 400.00 ..............................................................................................20

R.I. Gen. Laws §§ 11-47-8 to 11-47-18 ........................................................................20

Tex. Act of Apr. 12, 1871 ..............................................................................................10

Wyo. Comp. Laws ch. 52, § 1 .......................................................................................10

## OTHER AUTHORITIES

Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007) .................15

Brady Campaign to Prevent Gun Violence, *Brady State Scorecard New Jersey*
(2010)Prevent Gun Violence, *Brady State Scorecard New Jersey* (2010) .............................19

Centers for Disease Control and Prevention, *WISQARS Injury Mortality Reports* (2007) .......1, 19

Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun
Assault* AMER. J. PUB. HEALTH, vol. 99, No. 11 at 1, 4 (Nov. 2009)......................................13

D.W. Webster, *et al.*, *Effects of State-Level Firearm Seller Accountability Policies on
Firearm Trafficking* 86 J. URBAN HEALTH: BULLETIN OF THE N.Y. ACAD. OF MED.
525 (2009)....................................................................................................................20, 22

D.W. Webster, *et al.*, *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns* 7 INJURY PREVENTION 184 (2001)........20, 22

Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (Oct. 2009) ........................................................................................11

David Hemenway, *Road Rage in Arizona: Armed and Dangerous* 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002) ..........................................................................14

Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms* 275 J. AM. MED. ASS'N 1759 (1996)................................................20, 22

Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904)......................11

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA LAW REVIEW 1443 (2009)..........16

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3)*, 1 Cont. L.J. 259 (1874) ..........................................................................................11

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868)....................................11

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868)..........................................................................................................................11

Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the Home?*, 59 SYRACUSE L. REV. 225 (2008) ................................................................................................11

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009)..............................................................13

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership* J. PUB. ECON. 379, 387 (2006)......................................................................................................................................14

Violence Policy Center, *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders*, July 2009 ....................................................................................12

## INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the risks that it presents.  128 S. Ct. 2783 (2008).  Guns are designed to kill, and gun possession and use subject others to a serious risk of harm that is all too often deadly.  While the Supreme Court has held that the Second Amendment protects a limited right of law-abiding, responsible people to possess a gun *in the home* for self-defense, the Court has never recognized a far broader right to carry guns in public places, which would subject the public-at-large to those grave risks.  On the contrary, *Heller* found that restrictions on public carrying are in line with permissible gun laws. *Heller*, 128 S. Ct. at 2816-17.

Courts around the nation have refused to extend *Heller*'s limited holding beyond the home,[1] and New Jersey courts have repeatedly held that *Heller* bears no impact on the validity of the state's gun purchase and carry permit procedures. *See In re Echevarria,* 2010 WL 4028108, at *9 (N.J. Super. Ct. App. Div. Aug. 20, 2010); *In re Novello*, 2010 WL 2795030, at *4 (N.J. Super. Ct. App. Div. July 15, 2010); *In re Factor*, 2010 WL 1753307, at *3 (N.J. Super. App. Div. Apr. 21, 2010).  New Jersey's gun carrying law that requires permit-seekers to have a "justifiable need" to carry a loaded gun in public has helped New Jersey achieve one of the lowest gun death rates in the nation, less than half the national average.[2]

In *Heller* and *McDonald v. City of Chicago*, the Court had ample opportunity to announce a right to carry in public.  *See McDonald*, 130 S. Ct. 3020 (2010); *Heller*, 128 S. Ct. 2783.  After all, the Court did not limit itself to the constitutionality of the D.C. law at issue, but expounded at length on the limited nature of the Second Amendment right.  Yet it repeatedly stated its holding as bound to the home.  Numerous courts, from the 19th century to post-*Heller* and *McDonald*, have recognized that the Second Amendment does not prevent states from restricting or barring the carrying of handguns in public.  *See, e.g., Robertson v. Baldwin*, 165

---

[1] *See infra*, pp.8-10.

[2] Centers for Disease Control and Prevention, *WISQARS Injury Mortality Reports* (2007), available at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html (New Jersey's gun death rate is 5.15 per 100,000, compared to the national average of 10.34).

U.S. 275, 281-82 (1897) (holding that "the right of the public to bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons").  It would be unprecedented and unwise, therefore, to hold that the Constitution bars states and communities from choosing to keep guns out of public places, or – as New Jersey has done – from allowing those tasked with protecting public safety to determine whether individuals have a "justifiable need" to bring handguns into public spaces.  There is no Constitutional requirement that the general public, when walking to school, driving to work, or otherwise going about their daily activities, be subjected to the risks of gun carrying.  And there never has been.

An extension of the Second Amendment to deny licensing officials the authority to determine who has a "justifiable need" to carry guns in public would run counter to *Heller* and *McDonald*'s "assurances" that "reasonable firearms regulations" will remain permissible, as well as the Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald*, 130 S. Ct. at 3047; *Heller*, 128 S. Ct at 2816-17, 2871 & n. 26.  New Jersey law governing the public carry of weapons is precisely such a reasonable regulation.

The permitting process of N.J. Stat. § 2C:58-4 and N.J. Admin. Code §§ 13:54-2.3, 2.4, 2.5, and 2.7 does not implicate protected Second Amendment activity and even if it did, requiring a showing of "justifiable need" as a condition to issuing a permit to carry is a reasonable, justified, and permissible exercise of the state's police powers.  So is entrusting issuing authority to judges and law enforcement officials specifically designated by the New Jersey Legislature.  While Plaintiffs may disagree with the permit laws, their recourse – as New Jersey courts have reiterated – is through the legislative process, not the judiciary.  This Court is obligated to uphold legislation where there is a reasonable basis to do so; it should not usurp the functions of the Legislature and local law enforcement by declaring a new Second Amendment right that the Supreme Court has not acknowledged and by striking down a law that so plainly satisfies the state's interest in protecting public safety.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

## INTEREST OF *AMICI*

*Amicus* the Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws. *Amicus* brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

*Amicus* Ceasefire NJ, a project of the Coalition for Peace Action of Princeton, New Jersey, is the state's oldest organization devoted to reducing gun violence.  Ceasefire NJ has written and promoted the majority of gun legislation enacted in New Jersey over the past twenty-five years.

*Amicus* New Jersey Million Mom March Chapters of the Brady Campaign to Prevent Gun Violence are part of a nationwide network of local volunteer activists of the Brady Campaign to Prevent Gun Violence, the country's largest, non-partisan, grassroots organization leading the fight to prevent gun violence.  Chapter volunteers mobilize local support for sensible gun laws to protect families and communities from gun violence.  Four New Jersey Million Mom March Chapters work throughout the state on federal and state legislation and elections, education and awareness campaigns, linking with victims, and coalition building and community outreach.  Chapters are devoted to creating an America free from gun violence, where all Americans are safe at home, at school, at work, and in their communities.

## LEGAL BACKGROUND

Recent Supreme Court Second Amendment Jurisprudence:  In *Heller*, the Supreme Court recognized an individual right to keep and bear arms in the home for the purpose of self-defense. 128 S. Ct. at 2818.  While the Court could have simply decided whether the District's handgun ban was unconstitutional, it went out of its way to assure courts that its holding did not "cast doubt" on other gun laws – even approving of the constitutionality of a number of laws and then

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

making clear that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 2816-17, 2871 & n. 26. Those "presumptively lawful" measures included laws restricting, and even banning, the public carry of weapons. In approvingly discussing long-understood limitations on the right to keep and bear arms, the Court specifically noted that "the majority of the 19th-century courts" considered outright "prohibitions on carrying concealed weapons . . . lawful under the Second Amendment or state analogues." *Id.* at 2816.

Nor did the Court suggest that the Second Amendment requires that at least some form of public carrying must be permitted. Rather, the Court repeatedly referenced the home in its holding. And the Court made clear that "carry" did not imply "outside the home," as the Court ultimately held that "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license *to carry it in the home*." 128 S. Ct. at 2822 (emphasis added).[3]

In *McDonald*, the Court incorporated the Second Amendment to the states, but also "repeat[ed]" the "assurances" it made in *Heller* regarding its limited effect on other gun laws, and agreed that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment." 130 S. Ct. at 3047 (internal citation omitted). Once again, the Court did not extend the Second Amendment right outside the home.

The Open Question: Standard of Review: Neither *Heller* nor *McDonald* articulated a standard of review for Second Amendment challenges, though the Court in *Heller* explicitly rejected the "rational basis" test and implicitly rejected the "strict scrutiny test." *See Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) (the "strict scrutiny standard of review would not square with the [*Heller*] majority's references to 'presumptively lawful regulatory measures' . . . ."). The Court's reasoning also foreclosed any form of

---

[3] The narrow scope of the Court's ruling in *Heller* was also apparent in the Court's 2009 opinion in *United States v. Hayes*, 129 S. Ct. 1079 (2009), in which the Court upheld a broad reading of 18 U.S.C. § 922(g)(9) – which prohibits possession of firearms by persons convicted of misdemeanor crimes of domestic violence – without even mentioning the Second Amendment.

heightened scrutiny that would require the government to ensure that firearms legislation has a tight fit between means and ends, as *Heller* recognized that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 130 S. Ct. at 2822, and listed as examples a host of "presumptively lawful" existing firearms regulations without subjecting those laws to any such analysis. *Id.* at 2816-17 & n. 26.

      *Heller* and *McDonald* thus left lower courts with the task of determining an appropriate standard of review for Second Amendment claims: one that is less rigorous than strict scrutiny, "presumes" the lawfulness of a wide gamut of gun laws currently in force, allows for "reasonable firearms regulations," and permits law-abiding, responsible citizens to keep guns in their homes for self-defense. As discussed below, the "reasonable regulation" test, overwhelmingly applied by courts throughout the country construing right to keep and bear arms provisions in the states, is the most appropriate standard of review for the New Jersey statute at issue here.

      <u>The Two-Pronged Approach</u>:  In the wake of *Heller* and its progeny, the Third Circuit and others have begun to utilize a two-pronged approach to Second Amendment claims.  *See, e.g.*, *United States v. Marzzarella*, --- F.3d ---, 2010 WL 2947233 at *2 (3d Cir. 2010); *United States v. Skoien*, --- F.3d ---, 2010 WL 2735747 (7th Cir. 2010); *Heller II*, 698 F. Supp. 2d at 188.  Under this approach, courts ask:  (1) does the law or regulation at issue implicate protected Second Amendment activity, and (2) if so, does it withstand the appropriate level of scrutiny? *See, e.g.*, *Heller II*, 698 F. Supp. 2d at 188; *Marzzarella*, 2010 WL 2947233 at *2.  If the challenged law or regulation does not implicate protected Second Amendment activity, then the analysis ends and the law is deemed constitutional.  Even if the law implicates protected activity, however, it still will be deemed constitutional if it passes muster under the appropriate level of scrutiny.  *Marzzarella*, 2010 WL 2947233 at *2.

      This two-pronged approach represents an appropriate manner in which to approach the issues presented by Second Amendment claims.  *Amici* advocate its use by this Court in analyzing the constitutionality of N.J. Stat. § 2C:58-4 and N.J. Admin. Code §§ 13:54-2.3, 2.4, 2.5, and 2.7.

**ARGUMENT**

For at least two principal reasons, the firearms permitting regulations are constitutional. First, the permitting process in N.J. Stat. § 2C:58-4 and N.J. Admin. Code §§ 13:54-2.3, 2.4, 2.5, and 2.7 does not implicate protected Second Amendment Activity. Second, even if it did, the provisions are reasonable regulations that further important governmental interests established by the New Jersey Legislature.

**I.      THE PERMITTING PROCESS IN N.J. STAT. § 2C:58-4 AND N.J. ADMIN. CODE §§ 13:54-2.3, 2.4, 2.5, AND 2.7 DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.**

In analyzing the pending motion to dismiss, *amici* respectfully suggest that the Court use the two-prong approach to Second Amendment claims and hold that the permitting process in N.J. Stat. § 2C:58-4 and N.J. Admin. Code §§ 13:54-2.3, 2.4, 2.5, and 2.7 does not implicate protected Second Amendment activity because Plaintiffs have no general Second Amendment "right to 'possess and carry weapons in case of confrontation'" in public places.

**A.      The Public Carry Permitting Process at Issue Here Does Not Implicate Protected Second Amendment Activity Because it Does Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*.**

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." *Heller*, 128 S. Ct. at 2821 (emphasis added). In the course of its lengthy majority opinion, the Court had ample opportunity to state that Mr. Heller had a right to carry guns in public. However, it did not do so: the Court never recognized a right to carry guns in public. The Court's holding only mentions Heller's right "*to carry [] in the home*," *id.* at 2822 (emphasis added), and does not mention the carrying of firearms in public at all. *See id*. The Court's opinion focuses on the historical recognition of the right of individuals "to keep and bear arms to defend their homes, families or themselves," *id.* at 2810, and the continuing need to keep and use firearms "in defense of hearth and home." *Id.* at 2821. The Court's holding is specifically limited to the right to keep firearms in the home: "[i]n sum, we hold that the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against

rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense." *Id.* at 2821-22 (emphasis added).

Plaintiffs argue, essentially, that the *Heller* Court embraced a Constitutional right to carry guns in public, but for some reason chose not to say so explicitly. This, however, is a misreading of *Heller*. Indeed, Plaintiffs cannot explain why Justice Scalia would be so explicit about the fact that the Second Amendment was "not unlimited" and that a (non-exhaustive) host of gun laws remained "presumptively lawful," yet keep his supposed ruling that the Second Amendment protected a right to carry guns in public hidden and implicit, leaving courts with (at most) supposed tea leaves on which to find a broad right to carry in public.[4] Nor can Plaintiffs explain why the *Heller* Court expressly approved of decisions upholding concealed carry bans, but chose not to state the flip-side that is crucial to Plaintiffs' argument – that some form of public carrying must be permitted.

This Court should not reach for an interpretation of *Heller* that would cast aside longstanding judicial support for statutory restrictions on public carrying – especially given *Heller*'s explicit embrace of concealed carry bans and its repeated statements limiting its holding to the home. Indeed, courts "should give considerable deference to the legislative determination in this field," *State v. Ingram*, 488 A.2d 545, 550 (N.J. 1985), and "accede[]" to the Legislature's "regulation" of "the dangers inherent in the carrying handguns," *In re Preis*, 573 A.2d 148, 151 (N.J. 1990). It should not, as Plaintiffs propose, expand a novel Constitutional right to strike down democratically-enacted legislation.

In keeping with this case law, New Jersey courts have refused to read *Heller* and *McDonald* as recognizing a right to carry guns in public. And they have rejected the very arguments plaintiffs now seek to revive – that *Heller* overturned the Legislature's longstanding

---

[4] Nor do the Court's "tea leaves" even indicate its recognition of a right to carry guns in public. For example, the *Heller* Court discussed "bear" as meaning "carry" simply to support its position that the Second Amendment's use of "bear arms" "in no way connotes participation in a structured military organization," and, therefore, the Court opined, the phrase did not indicate that the Second Amendment was limited to militia matters. 128 S. Ct. at 2793. The *Heller* Court did ***not*** state that the Second Amendment protects a right to carry arms in public.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

authority to restrict public carrying of firearms.  In *In re Factor*, for instance, the court explicitly stated "Nothing in *Heller* leads us to conclude that the New Jersey may have run afoul of the Second Amendment by prohibiting appellant from carrying a handgun without" satisfying the state's permit requirements.  2010 WL 1753307, at *3.  Further, the court rebuffed the notion that *Heller* even *hinted* at a constitutional right to carry in public, and asserted, "[T]he United States Supreme Court has not held *or even implied* that the Second Amendment prohibits laws that restrict carrying of concealed weapons."  *Id.* (emphasis added).

This rejection of Plaintiffs' reasoning is hardly unique; New Jersey courts have repeatedly stated that *Heller* bears no impact on the state's permitting process.  *See In re Echevarria*, 2010 WL 4028108, at * 9 (holding that *Heller* applied to "handgun possession in the home" and had "*no impact* upon the constitutionality" of New Jersey's gun licensing laws) (emphasis added); *In re Novello*, 2010 WL 2795030, at *4 ("*Heller* also has no bearing on whether the Chief of Police had a sufficient basis to conclude that issuance . . . of [a] handgun purchase permit and [identity card] would not be in the interest of the public's health, safety, and welfare."); *In re Dubov*, 981 A.2d 87, 91 (N.J. Super. Ct. App. Div. 2009) ("[T]he Court [in *Heller*] expressly indicated that its holding did not require invalidation of statutes that require a license to purchase or possess a firearm.").

Other courts have held similarly that the Second Amendment, post-*Heller*, does not protect a right to carry weapons in public.  In *People v. Dawson*, the Illinois Court of Appeals rejected arguments strikingly similar to Plaintiffs', and held:

> The specific limitations in *Heller* and *McDonald* applying only to a ban on handgun possession in a home cannot be overcome by defendant's pointing to the *Heller* majority's discussion of the natural meaning of "bear arms" including wearing or carrying upon the person or in clothing. Nor can the *Heller* majority's holding that the operative clause of the second amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" require heightened review of the AUUW statute's criminalization of the carrying of an uncased and loaded firearm.  As addressed above, *Heller specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home*, not the right to possess handguns outside of the home in case of confrontation-a fact the dissent heartily pointed out by noting that "[n]o party or *amicus* urged this interpretation; the Court appears to have fashioned it out of whole cloth." The *McDonald* Court refused to expand on this right,

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

explaining that the holding in *Heller* that the second amendment protects "the right to possess a handgun in the home for the purpose of self-defense" was incorporated.

2010 WL 3290998, *7 (Ill. App. Ct. Aug. 18, 2010) (internal citations omitted) (emphasis added).  Recognizing that "when reasonably possible, a court has the duty to uphold the constitutionality of a statute," *id*. at *6, the *Dawson* Court rejected the contention that the Second Amendment protects a broad right to carry that would invalidate Illinois's law.

Maryland's highest Court also recognized that "wearing, carrying, or transporting a handgun, without a permit and outside of one's home, is outside of the scope of the Second Amendment." *Williams v. State*, --- A.3d. ----, 2011 WL 13746, at *1 (Md. Jan. 5, 2011).  The Kansas Court of Appeals also recognized that "[i]t is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes. [The defendant's] argument, that *Heller* conferred on an individual the right to carry a concealed firearm, is unpersuasive."  *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009).

Other courts – both state and federal – have similarly held that the right recognized in *Heller* and *McDonald* is confined to the home.  *See, e.g.*, *Gonzalez v. Village of West Milwaukee*, 2010 WL 1904977, *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *United States v. Hart*, 2010 WL 2990001, *3 (D. Mass. July 30, 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Dorr v. Weber*, 2010 WL 1976743, *8 (N.D. Iowa May 18, 2010) ( "[A] right to carry a concealed weapon under the Second Amendment has not been recognized to date"); *Teng v. Town of Kensingson*, 2010 WL 596526 (D. N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright prohibition on carrying concealed weapons" as "presumptively lawful". . . far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.") (internal citation omitted); *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) (Second Amendment does not "compel the District to license a resident to

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

carry and possess a handgun outside the confines of his home, however broadly defined.");
*Riddick v. United States*, 995 A.2d 212, 222 (D.C. 2010) (same); *United States v. Tooley*, 2010
WL 2380878, *15 (S.D.W.Va. June 14, 2010) ("Additionally, possession of a firearm outside of
the home or for purposes other than self-defense in the home are not within the "core" of the
Second Amendment right as defined by *Heller.* "). And *In re Bastiani*, 881 N.Y.S.2d 591, 593
(2008), upheld New York's law that limited carrying to those permitted based on "special need,"
noting that "[r]easonable regulation of handgun possession survives the *Heller* decision."

 Furthermore, in New Jersey, and across the country, this understanding of the Second
Amendment (and its state analogues) as not protecting a general right to carry or a more
particular right to carry concealed weapons pre-dates *Heller.  See Robertson v. Baldwin*, 165
U.S. at 281-82; *Preis*, 573 A.2d at 150 ("Our laws draw careful lines between permission to
possess a gun in one's home or place of business . . . and permission to carry a gun."); *Siccardi v.
State*, 284 A.2d 533, 553 (N.J. 1971) ("As early as 1882 [New Jersey law] prohibited the
carrying of guns by young persons and almost a half a century ago it directed that no persons . . .
shall carry handguns except pursuant to permits issuable only on a showing of need."); *see also*
1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing]
upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of
any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Fife v. State*, 31
Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the
State without any infringement of the constitutional right" to bear arms); *English v. State*, 35
Tex. 473, 473, 478 (1871); *Hill v. State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of
thought that extends the guarantee"—in the state Constitution of the "right of the people to keep
and bear arms"—"to the right to carry pistols, dirks, Bowieknives, and those other weapons of
like character, which, as all admit, are the greatest nuisances of our day."); *State v. Workman*, 35
W. Va. 367, 373 (1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908); *Aymette v. State*, 21
Tenn. 154, 159-61 (1840) ("The Legislature . . . have a right to prohibit the wearing or keeping
weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

warfare, or would not contribute to the common defense."); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v. Jumel*, 13 La. Ann. 399, 400 (1858).[5]

 Noted scholars and commentators have also long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places.  For example, John Norton Pomeroy's Treatise, which *Heller* cited as representative of "post-Civil War 19th century sources" commenting on the right to bear arms, 128 S. Ct. at 2812, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868).  Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons." Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 Cont. L.J. 259, 287 (1874).  An authoritative study published in 1904 concluded that the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons," which demonstrated that "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security." Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904).  Post-*Heller*, scholars continue to recognize the logic behind limiting the right to the home.  *See, e.g.*, Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (Oct. 2009); Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the Home?,* 59 SYRACUSE L. REV. 225 (2008).

 The permitting process at issue in this case does not meaningfully impede on the ability

---

[5] *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which the Kentucky Supreme Court declared Kentucky's concealed-weapons ban in conflict with its Constitution, is recognized as an exception to this consistent precedent.  *See* Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868). In fact, the Kentucky legislature later corrected the anomalous decision by amending the state constitution to allow a concealed weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

of individuals to keep handguns in defense of their homes.  Instead, it only impacts the carrying

of weapons *in public*, a different issue entirely, and one that neither the Supreme Court nor other

courts have recognized as protected under the Second Amendment.  As a result, the Court should

not find that Plaintiffs are challenging protected Second Amendment activity.

> **B.**     **The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public.**

There are profound public safety rationales for restricting guns in public, as courts

continue to recognize post-*Heller*:

> Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender.  A person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety . . . .

*People v. Yarbrough*, 169 Cal.App.4th 303, 314 (2008) (internal quotations and citations

omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (there is an

"inherent risk of harm to the public of such dangerous instrumentality being carried about the

community and away from the residence or business of the possessor").  The carrying of firearms

in public pose a number of issues and challenges not presented by the possession of firearms in

the home.  Three issues, in particular, are worthy of note.

First, when firearms are carried out of the home and into public, the safety of a broader

range of individuals is threatened.  While firearms kept in the home are primarily a threat to their

owners, family members, friends, and houseguests, firearms carried in public are a threat to

strangers, law enforcement officers, random passersby, and other private citizens.  One study has

shown, for instance, that "[b]etween May 2007 and April 2009, concealed handgun permit

holders shot and killed 7 law enforcement officers and 42 private citizens."  Violence Policy

Center, *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders*,

July 2009.  States, therefore, have a stronger need to protect their citizens from individuals

carrying guns in public than they do from individuals keeping guns in their homes.

Second, the carrying of firearms in public is not a useful or effective form of self-defense

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

and, in fact, has been shown in a number of studies to *increase* the chances that one will fall

victim to violent crime.  One study, for instance, found that "gun possession by urban adults was

associated with a significantly increased risk of being shot in an assault," and that "guns did not

protect those who possessed them from being shot in an assault." Charles C. Branas, *et al.*,

*Investigating the Link Between Gun Possession and Gun Assault*, AMER. J. PUB. HEALTH, vol.

99, No. 11 at 1, 4 (Nov. 2009).  Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of
> running into an armed victim was very or somewhat important in their own choice
> to use a gun.  Currently, criminals use guns in only about 25 percent of
> noncommercial robberies and 5 percent of assaults.  If increased gun carrying
> among potential victims causes criminals to carry guns more often themselves, or
> become quicker to use guns to avert armed self-defense, the end result could be
> that street crime becomes more lethal.

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare*

*Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public has other negative implications for a number of

social issues and societal ills that are not impacted by the private possession of handguns in the

home.  When the carrying of guns in public is restricted, "possession of a concealed firearm by

an individual in public is sufficient to create a reasonable suspicion that the individual may be

dangerous, such that an officer can approach the individual and briefly detain him in order to

investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957,

959 (1991); *see also Commonwealth v. Romero*, 673 A.2d 374, 377 (1996) ("officer's

observance of an individual's possession of a firearm in a public place in Philadelphia is

sufficient to create reasonable suspicion to detain that individual for further investigation").

Law enforcement's ability to protect the public could be greatly restricted if officers were

required to effectively presume that a person carrying a firearm in public was doing so lawfully.[6]

Under such a legal regime, it is possible that an officer would not be deemed to have cause to

---

[6] In fact, this Circuit and the New Jersey Supreme Court both recognize the constitutionality of
the *opposite* presumption: that a gun carrier "does not possess . . . a license or permit . . . until he
establishes to the contrary."  *McCandless v. Beyer*, 835 F.2d 58, 61 (3d Cir. 1987) (upholding
presumption *against* lawful carrying in N.J. Stat. § 2C:39-2b); *State v. Ingram*, 488 A 2d. at 549-
50 (same).

arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public. Further, if drivers are allowed to carry loaded guns, road rage can become a more serious and even potentially deadly phenomenon. David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002). And an increase in gun prevalence in public may cause an intensification of criminal violence. Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379, 387 (2006).

The permitting process at issue here prevents many of these risks to the public, without implicating the Second Amendment activity protected in *Heller*. Individuals in New Jersey who are not otherwise disqualified by operation of law and who can demonstrate that they can possess and use firearms responsibly are allowed to maintain handguns to protect themselves in the home. *Heller* simply provides no basis for expanding that authority into a broad constitutional right to carry weapons in public.

## II.   EVEN IF THE PUBLIC CARRY PERMITTING PROCESS IN N.J. STAT. § 2C:58-4 AND N.J. ADMIN. CODE §§ 13:54-2.3, 2.4, 2.5, AND 2.7 DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.

In choosing a level of scrutiny appropriate for Second Amendment challenges, courts need not – and should not – limit themselves to the choices utilized in First Amendment jurisprudence: strict scrutiny, intermediate scrutiny, or rational basis review. While these levels of scrutiny may seem to be the easiest and most obvious options in picking a standard of review, key differences between the First and Second Amendments suggest that using one of these three levels of scrutiny is *not*, in fact, an appropriate choice. The exercise of Second Amendment rights creates unique risks that threaten the safety of the community and can be far more lethal than even the most dangerous speech. While "words can never hurt me," guns are designed to inflict grievous injury and death – and often do. To protect the public from the risks of gun violence – unlike the significantly more modest risks posed by free speech – states must be allowed wide latitude in exercising their police power authority. Otherwise, the exercise of

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Second Amendment rights could infringe on the most fundamental rights of others – the preservation of life.

The Supreme Court, moreover, has not limited itself to these three levels of scrutiny in the past, but has instead fashioned a wide variety of standards of review that are tailored to specific constitutional inquiries.[7]  For all these reasons, a standard of review specific to the Second Amendment context is warranted here, particularly given the Supreme Court's recognition that an individual's right to bear arms must be evaluated in light of a state's competing interest in public safety.  To that end, *amici* respectfully suggest that this Court apply the test that state courts throughout the country have crafted and utilized for over a century in construing the right to keep and bear arms under state constitutions:  the "reasonable regulation" test.

### A.    The Reasonable Regulation Test is the Appropriate Standard of Review.

While courts are just beginning to grapple with a private right to arms under the federal Constitution, courts have construed analogous state provisions for over a century.  Over forty states have constitutional right-to-keep-and-bear-arms provisions, and despite significant differences in the political backdrop, timing, and texts of these provisions, the courts in these states have, with remarkable unanimity, coalesced around a single standard for reviewing limitations on the right to bear arms:  the "reasonable regulation" test.  *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 686-87, n. 12 (2007) (describing "hundreds of opinions" by state supreme courts with "surprisingly little variation" that have adopted the "reasonableness" standard of review for right-to-bear-arms cases).  Under the reasonable regulation test, a state "may regulate the exercise of [the] right [to bear arms] under

---

[7] *See, e.g.*, *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2649 (2008) (affirming that the Eighth Amendment's prohibition of cruel and unusual punishment should be measured by an "evolving standards of decency" test); *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) (applying an "undue burden" test to determine whether a statute jeopardized a woman's right to choose); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that determinations of procedural due process require a balancing of three competing interests); *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (upholding a "stop and frisk" under the Fourth Amendment where an officer had "reasonable grounds" to believe a suspect was armed and dangerous).

its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City & County of Denver*, 874 P.2d 325, 328, 333 n. 10 (Colo. 1994).[8]  More demanding than rational basis review, but more deferential than intermediate scrutiny, this "reasonable regulation" test protects Second Amendment activity without unduly restricting states from protecting the public from gun violence.  The test recognizes "the state's right, indeed its duty under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people."  *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989).  The reasonable regulation test, which was specifically designed for cases construing the right to keep and bear arms and has been adopted by the vast majority of states, remains the standard of review best-suited for Second Amendment cases after *Heller* and for the case at hand.

The reasonable regulation test is a more heightened form of scrutiny than the rational basis test that the majority opinion in *Heller* rejected (and is more demanding than the "interest balancing" test suggested by Justice Breyer in dissent) because it does not permit states to prohibit all firearm ownership.  *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA LAW REVIEW 1443, 1458 (2009).  Instead, it "focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare."  *State v. Cole*, 665 N.W. 2d 328, 338 (Wis. 2003).  Laws and regulations governing the use and possession of firearms thus must meet a higher threshold under the reasonable regulation test than they would under rational basis review.

Although the reasonable regulation test may be more deferential than intermediate or strict scrutiny, it is not toothless.  Under the test, laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of a Second Amendment right,

---

[8] *See also Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007) (the relevant inquiry is "whether the statute at issue is a 'reasonable' limitation upon the right to bear arms"); *Jackson v. State*, 68 So.2d 850, 852 (Ala. Ct. App. 1953) ("It is uniformly recognized that the constitutional guarantee of the right of a citizen to bear arms, in defense of himself and the State . . . is subject to reasonable regulation by the State under its police power.").

*State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), must be struck down. Laws that are reasonably designed to further public safety, by contrast, are upheld. *See, e.g.*, *Robertson v. City & County of Denver*, 874 P.2d at 328, 330 n. 10 ("The state may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable."); *Jackson*, 68 So.2d at 852 (same); *Bleiler v. Chief, Dover Police Dep't*, 927 A.2d at 1223 (same).

Nor would adopting the reasonable regulation test here be at odds with district courts that have elected to use intermediate scrutiny following *Heller*. In virtually every post-*Heller* case where a district court has adopted intermediate scrutiny, the court was evaluating a particular provision of 18 U.S.C. § 922, the federal firearms statute that imposes restrictions on broad classes of individuals and types of arms. *See, e.g.*, *Marzzarella*, 2010 WL 2947233 at *1 (evaluating § 922(k) barring possession of a handgun with an obliterated serial number); *United States v. Yanez-Vasquez*, 2010 WL 411112 (D. Kan. Jan. 28, 2010) (evaluating § 922(g)(5) barring illegal aliens from possessing firearms); *United States v. Miller*, 604 F. Supp. 2d 1162, 1164 (W.D. Tenn. 2009) (evaluating § 922(g) barring felons from possessing firearms); *United States v. Bledsoe*, 2008 WL 3538717, *1 (W.D. Tex. 2008) (evaluating § 922(x) barring juveniles from possessing firearms). By contrast, the New Jersey provisions involve a permitting process that relies on *individual* determinations and licensing officers' discretion, rather than broad categories.[9] Courts have always looked with a more wary eye on laws that impose restrictions on broad classes of people than laws that require individual determinations. Heightened scrutiny – like intermediate scrutiny – is less appropriate here.

The reasonable regulation test also has two particular strengths that intermediate scrutiny does not: (1) it affords licensing officers, whether law enforcement or judges, the discretion they

---

[9] The only exception appears to be a recent case in the United States District Court for the District of Columbia, *Heller v. District of Columbia* ("*Heller II*"), in which the plaintiffs challenged (1) the District of Columbia's firearm registration procedures, (2) the District's prohibition on assault weapons, and (3) the District's prohibition on large capacity ammunition feeding devices. 698 F. Supp. 2d 179, 181 (D.D.C. 2010). But even in that case, two of the three provisions that the district court was evaluating were broad restrictions on entire classes of firearms. *Id.*

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

need to adequately enforce handgun laws, and (2) it gives an appropriate amount of deference to legislative directives.

### 1. Licensing officers should be afforded an appropriate amount of discretion in enforcing firearm regulations.

Licensing officers are best situated to make determinations about who in their communities can carry concealed weapons safely and responsibly. They are likely to be more familiar with the backgrounds and personalities of the members of their communities than courts or juries situated miles (and perhaps even counties) away. They are best situated to know, for instance, whether a man requesting a carry permit previously has threatened his wife with violence (even if she, say, declined to testify against him so he was not formally charged), or whether for other reasons an individual requesting a permit would pose dangers if carrying weapons in public. These are precisely the types of decisions that need to be made in order to protect communities from firearm violence.

New Jersey's two-tiered approval process reflects the gravity of this task. First, law enforcement officials who conduct a first-level review of permit applications have a particular stake in who has and can carry firearms in their communities. Not only are law enforcement officials often tasked with enforcing state and local firearm regulations, they are also charged with responding to situations involving firearms and thus often suffer from the impacts of the irresponsible and criminal uses of firearms in greater numbers than the general population. Law enforcement officials are thus both uniquely qualified to assess who in their communities possess the proper qualifications and need to carry handguns and uniquely positioned to feel the effects of those decisions. Courts, accordingly, should afford them an appropriate degree of discretion is enforcing firearm regulations. *See, e.g., Avant Indus. Ltd. v. Kelly*, 318 A.2d 47, 50 (N.J. Super. Ct. App. Div. 1974) ("The Legislature has placed in defendant, [the Superintendent of State Police,] the discretion and authority to determine" procedures for reviewing gun permits "[and w]e defer to defendant's expertise in this field."); *see also Harman v. Pollock*, 586 F.3d 1254, 1265 (10th Cir. 2009) ("[Courts] must defer to trained law enforcement personnel,

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.").

Second, the grave dangers posed by public carrying justify New Jersey's additional reliance on judges to issue final approval of permit applications. Given the risks involved, requests for permission to carry deadly weapons in public *should* be thoroughly vetted. Thus, as the New Jersey Supreme Court has recognized, "[t]he permit to carry a gun is the most closely-regulated aspect of gun-control laws." *Preis*, 573 A.2d at 150. Those laws, and their impact, routinely come before courts, as "carrying a gun" comprises "the most heavily penalized" element of many crimes. *Id.* Judges, accordingly, play an integral role in effectuating the state's "careful grid of regulatory provisions," *id.*, and are appropriate arbiters in the license approval process. In fact, as *Preis* recognized, the "Legislature has designated the judiciary as the issuing authority for gun permits" *because* of the very "dangers inherent in carrying handguns and the urgent necessity for their regulation." *Id.* The Legislature entrusted its licensing officials' to exercise discretion in meeting that urgent necessity. This Court should respect that decision.

### 2. Given the governmental interest in protecting the public from the harms associated with firearms, deference to legislative directives is appropriate.

New Jersey's legislature has enacted some of the strongest laws in the nation to keep guns away from dangerous people, including curtailing the dangers of widespread carrying of loaded firearms in public.[10] These strong gun laws have helped New Jersey achieve one of the lowest gun death rates in the nation, less than one-half the national average.[11] The only states with lower gun death rates than New Jersey are Connecticut, Hawaii, Massachusetts, New York,

---

[10] *See* Brady Campaign to Prevent Gun Violence, *Brady State Scorecard New Jersey* (2010), *available at* http://bradycampaign.org/stategunlaws/scorecard/NJ/ (ranking New Jersey as having the second strongest gun laws in the nation).

[11] Centers for Disease Control and Prevention, *WISQARS Injury Mortality Reports* (2007), *available at* http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html (New Jersey's gun death rate is 5.15 per 100,000, compared to the national average of 10.34).

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

and Rhode Island, all states that also give police discretion to deny concealed carry permits.[12]

In fulfilling their responsibility to protect the public, states have enacted laws and permitting regimes – like the one at issue here – to ensure that guns are used responsibly and possessed by responsible, law-abiding persons.  These laws have helped reduce the use of guns in crime and saved lives.  *See, e.g.*, D.W. Webster, *et al.*, *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. URBAN HEALTH: BULLETIN OF THE N.Y. ACAD. OF MED. 525 (2009); D.W. Webster, *et al.*, *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 INJURY PREVENTION 184 (2001); Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED. ASS'N 1759 (1996).

There is a profound governmental interest in regulating the possession and use of firearms.  States have "cardinal civil responsibilities" to protect the health, safety, and welfare of their citizens. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008); *see also Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946) ("[T]he legislature may choose not to take the chance that human life will be lost . . . .").  States are thus generally afforded "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . ." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted).  Regulations on the carrying of firearms are an essential exercise of those powers, for the "promotion of safety of persons and property is unquestionably at the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).  For this reason, as New Jersey courts recognize, "[t]he State retains the power to establish its own standard for weapon possession licensure." *In re Borinsky*, 830 A.2d 507, 517 (N.J. Super. Ct. App. Div. 2003).

While individuals and organizations may differ on the net risks posed by guns in our society, such disagreement underlines that firearm regulation is best suited for the legislative arena, not the courts.  In fact, the New Jersey Supreme has specifically stated as much with

---

[12] *See* Conn. Gen. Stat. §§ 29-28 to 29-30, 29-32 to 29-32b, 29-35, 29-37; Haw. Rev. Stat. § 134-9; Mass. Gen. Laws ch. 140, §§ 131, 131C, 131P, ch. 269, § 10; N.Y. Penal Law §§ 400.00, 265.01, 265.20; R.I. Gen. Laws §§ 11-47-8 to 11-47-18.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

respect to *both* regulations that Plaintiffs challenge – the requirement that carry permit seekers demonstrate "justifiable need" and the discretion of licensing officials to assess it:

> [T]he Legislature made provision for other persons who could make a sufficient showing of "need," leaving to the Judges the required policy formulations as to what constitutes "need." The Legislature was fully aware that these formulations would represent the conscientious determinations of the Judges arrived at on the basis of their study of such expert materials as are available within and without the State. If the Legislature at any point differs with the approach adopted by the Judges, *it may take appropriate action through amendment of the Gun Control Act.*

*Siccardi v. State,* 284 A.2d at 554 (emphasis added); *see also Preis*, 573 A.2d at 151 ("We have acceded to th[e] legislative delegation [of licensing authority] because the New Jersey Legislature has long been aware of the dangers inherent in the carrying of handguns.") (internal quotations and citations omitted); *Hopewell Baptist Church of Newark, NJ v. Gary*, 266 A.2d 593, 596 (N.J. Super. Ct. App. Div. 1970) (noting that "the Legislature [is] the governmental branch best equipped to discern and enunciate public policy.").

Other courts have recognized the same. *See Miller*, 604 F. Supp. 2d at 1172 n. 13 ("[D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches."). Indeed, legislatures are designed to make empirical judgments about the need for and efficacy of regulation, even when that regulation affects the exercise of constitutional rights. *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (state legislatures are "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon legislative questions."); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) ("Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good within their respective spheres of authority.") (internal quotations and citations omitted). State governments "must [thus] be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.*, 427 U.S 50, 71 (1976).

The risks posed by invalidating or unduly restricting these legislative judgments on

firearms regulations is severe, and courts should review such legislative judgments with an appropriate amount of deference. Here, too, therefore, the reasonable regulation test is better situated than either intermediate or strict scrutiny to defer to legislative judgments. It allows for different permitting and concealed carry regimes depending on the needs of the particular state or locale, and recognizes the strong interest of the state in protecting its citizens rather than being overly focused on a narrow means-end nexus of the challenged regulation.

### B.      The Carry Permitting Process at Issue Is Constitutionally Permissible.

New Jersey's permitting process clearly passes the reasonable regulation test. Courts have repeatedly found that there is a "compelling state interest in protecting the public from the hazards involved with certain types of weapons, such as guns," *Cole*, 665 N.W. 2d at 344, particularly given "the danger [posed by the] widespread presence of weapons in public places and [the need for] police protection against attack in these places." *Id.* (internal quotations omitted).

Indeed, as discussed above, there is strong sociological and statistical evidence which suggests that permitting and registration procedures that make it more difficult for someone to carry a gun in public reduce both the number of gun deaths and criminal access to firearms. *See, e.g.*, Webster, *et al.*, *Relationship Between Licensing*, at 184. Webster, *et al.*, *Effects of State-Level*, at 525; Weil & Knox, *Effects of Limiting Handgun Purchases*, at 1759. The Second Amendment does not forbid state or local governments from using such protocols to achieve these ends and both state and federal courts have upheld them for decades.

Moreover, New Jersey's weapons permitting process is not an outright ban on the possession or carrying of firearms and thus does not even approach the blanket prohibition on handgun ownership that the Supreme Court struck down in *Heller. See Heller*, 128 S. Ct. at 2788. Instead, it merely requires individuals who wish to carry firearms outside the home to meet certain basic requirements and to have their request approved by law enforcement officials and judges. *See* N.J. Stat. § 2C:58-4 and N.J. Admin. Code §§ 13:54-2.3, 2.4, 2.5, and 2.7. Those officials, in turn, review applications to ensure that all the statutory requirements have

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

been met.  *See id.*  Furthermore any person "aggrieved" by the denial of their application by law enforcement officials "shall" be entitled to a hearing in Superior Court within 30 days, with "no formal pleading or filing fee . . . required." N.J. Stat. § 2C:58-4(e).  And such persons may further appeal in accordance with state law.  *See id.*  This is a perfectly reasonable process designed to ensure that individuals who carry concealed weapons can do so responsibly.  The New Jersey Legislature has already decided that this is a reasonable way to protect public safety.  The Court should not second-guess those judgments, particularly for firearms activity that has never been recognized as a Second Amendment right.

In sum, the New Jersey carry permitting process is both reasonable and not unduly restrictive of an individuals' Second Amendment right to keep guns in their home.  It is thus a valid exercise of state's "police powers to legislate as to the protection of the lives, limb, health, comfort, and quiet of all persons" and passes the reasonable regulation test.[13]  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted).

## CONCLUSION

For all the foregoing reasons, the Court should find that N.J. Stat. § 2C:58-4 and N.J. Admin. Code §§ 13:54-2.3, 2.4, 2.5, and 2.7 are constitutional.

---

[13] N.J. Stat. § 2C:58-4 and N.J. Admin. Code §§ 13:54-2.3, 2.4, 2.5, and 2.7 also would survive intermediate (or even strict) scrutiny were the Court to apply that standard of review because it is substantially related to an important government interest.  Indeed, a number of courts have found that the protection of the public from firearm violence is an important government interest, *see, e.g.*, *Heller II*, 698 F. Supp. 2d at 186; *Miller*, 604 F.Supp.2d at 1171; *Bledsoe*, 2008 WL 3538717 at *4, and upheld statutes that impose much broader restrictions on an individual's ability to possess and carry firearms. *See, e.g.*, *Marzzarella*, 2010 WL 2947233 at *7; *Heller II*, 698 F. Supp. 2d at 197; *State v. Sieyes*, 225 P.3d 995, 995 (Wash. 2010); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1233 (D. Utah); *Yanez-Vasquez*, 2010 WL 411112 at *3; *Miller*, 604 F.Supp.2d at 1171-72; *United States v. McCane*, 573 F.3d 1037, 1050 (10th Cir. 2009); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 789-91 (E.D. Va. 2009); *United States v. Radencich*, 2009 WL 127648 (N.D. Ind. Jan. 20, 2009); *United States v. Schultz*, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009); *People v. Flores*, 169 Cal. App. 4th 568, 574-75; *Bledsoe*, 2008 WL 3538717 at *4.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Dated: January 26, 2011                    Respectfully submitted,

                                              s/Peter R. Bisio
                                              Peter R. Bisio
Adam K. Levin
S. Chartey Quarcoo
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail:  adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

Counsel for *Amicus Curiae*