**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1150
_____

JOHN M. DRAKE; GREGORY C. GALLAHER;
LENNY S. SALERNO; FINLEY FENTON;
SECOND AMENDMENT FOUNDATION, INC.;
ASSOCIATION OF NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

Appellants

v.

THE HON. RUDOLPH A. FILKO, in his Official Capacity
as Judge of the Superior Court of Passaic County;
HON. EDWARD A. JEREJIAN, in his Official Capacity as
Judge of the Superior Court of Bergen County;
THE HON. THOMAS V. MANAHAN, in his Official
Capacity as Judge of the Superior Court of Morris County;
SUPERINTENDENT NEW JERSEY STATE POLICE;
CHIEF RICHARD COOK, in his Official Capacity as Chief
of the Montville, New Jersey Police Department;
ATTORNEY GENERAL OF NEW JERSEY;
ROBERT JONES, in his Official Capacity as Chief of the
Hammonton, New Jersey Police Department
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2-10-cv-06110)
District Judge: Honorable William H. Walls
_____

Argued February 12, 2013

Before: HARDIMAN and ALDISERT, <u>Circuit Judges</u>, and
STARK,[*] <u>District Judge</u>.

(Filed: July 31, 2013)

David D. Jensen
David Jensen PLLC
Suite 230
111 John Street
New York, NY 10038

Alan Gura [Argued]
Gura & Possessky, PLLC
101 North Columbus Street
Suite 405
Alexandria, VA 22314

<u>Attorneys for the Appellants</u>

_____

[*] The Honorable Leonard P. Stark, Judge of the United States
District Court for the District of Delaware, sitting by
designation.

Jeffrey S. Chiesa, Attorney General
Gregory A. Spellmeyer
Daniela Ivancikova
Robert T. Lougy
Mary E. Wood [Argued]
Office of the Attorney General of New Jersey
Department of Law and Public Safety
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625

<u>Attorneys for the Appellees</u>

Adam K. Levin
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Columbia Square
Washington, DC 20004

<u>Attorney for the Amicus Appellees</u>
_____

OPINION OF THE COURT
_____

ALDISERT, <u>Circuit Judge</u>.

Four New Jersey residents and two organizations (collectively "Appellants") appeal from a judgment of the United States District Court for the District of New Jersey that held constitutional N.J.S.A. § 2C:58-4, a New Jersey law regulating the issuance of permits to carry handguns in public

("Handgun Permit Law"). Appellants contend that the District Court erred because (1) the Second Amendment secures a right to carry arms in public for self-defense; (2) the "justifiable need" standard of the Handgun Permit Law is an unconstitutional prior restraint; and (3) the standard fails any level of means-end scrutiny a court may apply. We will affirm the judgment of the District Court.

## I.

Permits to carry handguns are "the most closely regulated aspect" of New Jersey's gun control laws. In re Preis, 573 A.2d 148, 150 (N.J. 1990). Individuals who wish to carry a handgun in public for self-defense must first obtain a license. N.J.S.A. § 2C:39-5(b).[1] The process and standard for obtaining such a license is found in New Jersey's Handgun Permit Law, N.J.S.A. § 2C:58-4.

Under New Jersey's Handgun Permit Law, individuals who desire a permit to carry a handgun in public must apply to the chief police officer in their municipality or to the superintendent of the state police. N.J.S.A. § 2C:58-4(c). The chief police officer or superintendent considers the application in accordance with the following provisions of the Handgun Permit Law:

---

[1] For exemptions to the general rule that individuals may not carry a handgun in public without a permit, see N.J.S.A. § 2C:39-6. For example, individuals employed in certain occupations may carry a firearm "in the performance of their official duties," see, e.g., N.J.S.A. § 2C:39-6(a)(2), and individuals may carry a firearm "in the woods or fields . . . for the purpose of hunting," see N.J.S.A. § 2C:39-6(f)(2).

> No application shall be approved by the chief police officer or the superintendent unless the applicant demonstrates that he is not subject to any of the disabilities set forth in 2C:58-3c. [which includes numerous criminal history, age and mental health requirements], that he is thoroughly familiar with the safe handling and use of handguns, *and that he has a justifiable need to carry a handgun*.

Id. (emphasis added). The meaning of "justifiable need," as it appears in this provision, is codified in the New Jersey Administrative Code as follows:

> [T]he urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun.

N.J. Admin. Code 13:54-2.4(d)(1).[2]

---

[2] This codification of the "justifiable need" standard closely mirrors an earlier explanation of "need" that was laid out by the Supreme Court of New Jersey in Siccardi v. State, 284 A.2d 533 (N.J. 1971). See id. at 557 (explaining that New Jersey law restricts the issuance of permits to those "who can establish an urgent necessity for . . . self-protection," which may be limited to those "whose life is in real danger, as evidenced by serious threats or earlier attacks"). Since Siccardi, many other New Jersey state court opinions have also explained this standard. See In re Preis, 573 A.2d at 152 ("[T]here must be an urgent necessity [] for self-protection.

Next, if the chief police officer or superintendent determines that the applicant has met all the requirements, including demonstration of a "justifiable need," the application is approved and sent to a superior court judge, who:

> shall issue the permit to the applicant if, but only if, it is satisfied that the applicant is a person of good character who is not subject to any of the disabilities set forth in section 2C:58-3c., that he is thoroughly familiar with the safe handling and use of handguns, and that he has a justifiable need to carry a handgun.

N.J.S.A. § 2C:58-4(d). If, alternatively, the chief police officer or superintendent determines that the applicant has not met the requirements, the applicant "may request a hearing in the Superior Court . . . by filing a written request for such a hearing within 30 days of the denial." Id. at § 2C:58-4(e).

II.

-----

The requirement is of specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means. Generalized fears for personal safety are inadequate . . . .") (internal citations and quotation marks omitted); In re Pantano, 60 A.3d 507, 510 (N.J. Super. Ct. App. Div. 2013) (discussing and applying "justifiable need" standard); In re Application of Borinsky, 830 A.2d 507 (N.J. Super. Ct. App. Div. 2003) (same).

6

Desiring to carry handguns in public for self-defense, the individual plaintiffs here each applied for a permit according to the process described above. Their applications were denied, however, because pursuant to N.J.S.A. § 2C:58-4(c) either a police official or superior court judge determined that they failed to satisfy the "justifiable need" requirement.[3] The organizational plaintiffs asserted that their members and supporters have been denied public-carry permits and have refrained from applying for permits because they cannot demonstrate a "justifiable need" as required by the Handgun Permit Law. Appellants sought declaratory and injunctive relief, contending that New Jersey may not condition the issuance of a public-carry permit on an applicant's ability to demonstrate a "justifiable need." The District Court rejected Appellants' arguments, and accordingly denied Appellants' motion for summary judgment and granted Appellees' motion to dismiss. Appellants timely appealed.[4]

---

[3] In March 2013, one of the original plaintiffs, Daniel Piszczatoski, was granted a permit on other grounds (as a retired law enforcement officer) and was dismissed as an Appellant.

[4] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, and could consider Appellants' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's determination that the New Jersey Handgun Permit Law is constitutional, United States v. Fullmer, 584 F.3d 132, 151 (3d Cir. 2009); the District Court's dismissal of Appellants' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, Monroe v. Beard, 536 F.3d 198, 205 (3d Cir. 2008); and the District Court's denial of Appellants' motion

III.

This appeal prompts us to consider multiple questions. We will consider each in turn following the two-step approach this Court set forth in United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010):

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

Here, we conclude that the requirement that applicants demonstrate a "justifiable need" to publicly carry a handgun for self-defense qualifies as a "presumptively lawful," "longstanding" regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee. Accordingly, we need not move to the second step of Marzzarella. Nevertheless, because of the important constitutional issues presented, we believe it to be beneficial and appropriate to consider whether the "justifiable need" standard withstands the applicable intermediate level of scrutiny. We conclude that even if the "justifiable need" standard did not qualify as a "presumptively lawful,"

---

for summary judgment, State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C., 566 F.3d 86, 89 (3d Cir. 2009) (citation omitted).

8

"longstanding" regulation, at step two of <u>Marzzarella</u> it would withstand intermediate scrutiny, providing a second, independent basis for concluding that the standard is constitutional.

IV.

It remains unsettled whether the individual right to bear arms for the purpose of self-defense extends beyond the home.[5] In 2008, the Supreme Court explicitly recognized for the first time that the Second Amendment confers *upon individuals* a right to keep and bear arms for self-defense by holding that a District of Columbia law forbidding the individual possession of usable handguns *in the home* violated the Second Amendment. <u>See</u> <u>District of Columbia v. Heller</u>, 554 U.S. 570, 595 (2008). In 2010, the Court recognized that the Second Amendment right articulated in <u>Heller</u> applied equally to the states through the Fourteenth Amendment. <u>See</u> <u>McDonald v. City of Chicago</u>, — U.S. —, 130 S. Ct. 3020, 3026 (2010). Taken together, these cases made clear that "Second Amendment guarantees are at their zenith within the home." <u>Kachalsky v. County of Westchester</u>, 701 F.3d 81, 89 (2d Cir. 2012), <u>cert. denied</u>, 133

---

[5] Rather than discussing whether or not the individual right to bear arms for the purpose of self-defense articulated in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) "extends beyond the home," it may be more accurate to discuss whether, in the public sphere, a right similar or parallel to the right articulated in <u>Heller</u> "exists." Firearms have always been more heavily regulated in the public sphere so, undoubtedly, if the right articulated in <u>Heller</u> does "extend beyond the home," it most certainly operates in a different manner.

S. Ct. 1806 (2013). Outside of the home, however, we encounter the "vast terra incognita" recognized by the Fourth Circuit in United States v. Masciandaro, 638 F.3d 458, 485 (4th Cir. 2011), cert. denied, 132 S. Ct. 756 (2011). Compare also Marzzarella, 614 F.3d at 92 ("[C]ertainly, to some degree, [the Second Amendment] must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes."), with Masciandaro, 638 F.3d at 475 ("There may or may not be a Second Amendment right in some places beyond the home.").

Although Heller does not explicitly identify a right to *publicly* carry arms for self- defense, it is possible to conclude that Heller implies such a right. The Seventh Circuit reached this very conclusion in Moore v. Madigan, 702 F.3d 933, 942 (7th Cir. 2012), when it stated that "[t]he Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside."[6] As the Second Circuit recently explained, however,

---

[6] We note that the Seventh Circuit gave the Illinois legislature time to come up with a new law that would survive constitutional challenge, implying that some restrictions on the right to carry outside the home would be permissible, while holding that the challenged law containing a flat ban on carrying a handgun in public was unconstitutional. Accordingly, on July 9, 2013 Illinois enacted a law requiring issuance of concealed carry licenses to individuals meeting basic statutory requirements similar to those required for New Jersey applicants, but the law does not require applicants to show a "justifiable need." Discretion in granting concealed carry licenses appears to be limited to a determination of whether the applicant "pose[s] a danger to himself, herself, or

Heller "was never meant 'to clarify the entire field' of Second Amendment jurisprudence," Kachalsky, 701 F.3d at 89 (quoting Heller, 554 U.S. at 635), but rather struck down a single law that "ran roughshod" over D.C. residents' individual right to possess usable handguns *in the home*, id. at 88. Hence, the Seventh Circuit in Moore may have read Heller too broadly. As the Seventh Circuit itself had earlier stated in United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1674 (2011), Heller's language "warns readers not to treat Heller as containing broader holdings than the Court set out to establish: that the Second Amendment created individual rights, one of which is keeping operable handguns *at home* for self-defense." Id. (emphasis added).

Appellants contend also that "[t]ext, history, tradition and precedent all confirm that [individuals] enjoy a right to *publicly* carry arms for their defense." Appellants' Brief 12 (emphasis added). At this time, we are not inclined to address this contention by engaging in a round of full-blown historical analysis, given other courts' extensive consideration of the history and tradition of the Second Amendment. See, e.g., Heller, 554 U.S. at  605-619 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."). We reject Appellants' contention that a historical analysis leads *inevitably* to the conclusion that the Second Amendment confers upon individuals a right to carry handguns in public

---

others, or a threat to public safety." Firearm Concealed Carry Act, Illinois Public Act 098-0063, available at http://www.ilga.gov/legislation/publicacts/98/PDF/098-0063.pdf.

for self-defense. As the Second Circuit observed in Kachalsky, "[h]istory and tradition do not speak with one voice here. What history demonstrates is that states often disagreed as to the scope of the right to bear arms, whether the right was embodied in a state constitution or the Second Amendment." 701 F.3d at 91.

For these reasons, we decline to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home, the "core" of the right as identified by Heller. We do, however, recognize that the Second Amendment's individual right to bear arms *may* have some application beyond the home. Ultimately, as our Court did in Marzzarella, we refrain from answering this question definitively because it is not necessary to our conclusion.

## V.

Assuming that the Second Amendment individual right to bear arms does apply beyond the home, we next consider whether or not the requirement that applicants demonstrate a "justifiable need" to publicly carry a handgun for self-defense burdens conduct within the scope of that Second Amendment guarantee. See Marzzarella, 614 F.3d at 92. As this Court has stated, certain longstanding regulations are "exceptions" to the right to keep and bear arms, such that the conduct they regulate is not within the scope of the Second Amendment. See United States v. Barton, 633 F.3d 168, 172 (3d Cir. 2011); United States v. Huet, 665 F.3d 588, 600 (3d Cir. 2012). Here, we agree with the District Court that even if some protected right to carry arms outside the home exists, the challenged requirement that applicants demonstrate a "justifiable need" to obtain a permit to publicly carry a

handgun for self-defense qualifies as a "longstanding," "presumptively lawful" regulation.

In <u>Heller</u> the Supreme Court noted that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" and identified these "regulatory measures" as "presumptively lawful" ones. 554 U.S. at 571, 571 n.26. It then stated that the presumptively lawful regulations it identified by name did not compose an "exhaustive" list, but the Court did not provide guidance on how to identify other regulations that may qualify. <u>Id.</u>

Exploring the meaning of "presumptively lawful," this Court has stated that "presumptively lawful" regulatory measures are "exceptions to the Second Amendment guarantee." <u>Marzzarella</u>, 614 F.3d at 91.[7] Acknowledging that

_____

[7] As this Court stated in <u>Marzzarella</u>:

> We recognize the phrase "presumptively lawful" could have different meanings under newly enunciated Second Amendment doctrine. On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny. Both readings are reasonable

the exceptions identified in Heller "all derived from historical regulations," the Marzzarella Court stated that "it is not clear that pre-ratification presence is the only avenue to a categorical exception." Id. at 93. Although Marzzarella stated also that "prudence counsels caution when extending [the] recognized [Heller] exceptions to novel regulations unmentioned by Heller," 614 F.3d at 93, we nevertheless conclude, for the reasons that follow, that the requirement that applicants demonstrate a "justifiable need" to publicly carry a handgun for self-defense is a presumptively lawful, longstanding licensing provision under the teachings of Heller and Marzzarella.

The "justifiable need" standard Appellants challenge has existed in New Jersey in some form for nearly 90 years. See Siccardi v. State, 284 A.2d 533, 538 (N.J. 1971). Beginning in 1924[8] New Jersey "directed that no persons (other than those specifically exempted such as police officers and the like) shall carry [concealed] handguns except

---

interpretations, but we think the better reading, based on the text and the structure of Heller, is the former—in other words, that these longstanding limitations are exceptions to the right to bear arms.

614 F.3d at 91.

[8] In 1905, New Jersey enacted a statute providing for criminal punishment of the concealed carrying of "any revolver, pistol, [or] firearm," but allowed an exception for those with permits. Compiled Statutes of New Jersey, Vol. II., 1759 (Soney & Sage 1911). It does not appear, however, that the law contained any standards for issuance of such permits. Id.

pursuant to permits issuable only on a showing of 'need.'" Id. (internal citations omitted). In 1966, New Jersey amended its laws to prohibit individuals from carrying handguns in public, in any manner, without first obtaining a permit, and again conditioned the issuance of such permits on a showing of need. The predecessor to the Handgun Permit Law subsequently underwent multiple revisions, the requirement of "need" enduring each, and ultimately the present-day standard of "justifiable need" became statutorily enshrined in 1978.

New Jersey's longstanding handgun permitting schema is not an anomaly. Many recent judicial opinions have discussed historical laws regulating or prohibiting the carrying of weapons in public. See, e.g., Peterson v. Martinez, 707 F.3d 1197, 1201 (10th Cir. 2013) ("extending" the recognized Heller exceptions to cover regulations on the carrying of concealed firearms, stating that "[i]n light of our nation's extensive practice of restricting citizens' freedom to carry firearms in a concealed manner, we hold that this activity does not fall within the scope of the Second Amendment's protections"). In the 19th Century, "[m]ost states enacted laws banning the carrying of concealed weapons," and "[s]ome states went even further than prohibiting the carrying of concealed weapons . . . bann[ing] concealable weapons (subject to certain exceptions) altogether whether carried openly or concealed." Kachalsky, 701 F.3d at 95-96. As Appellants correctly note, some state courts determined that prohibitions on concealed carrying were permissible because open carrying remained available as an avenue for public carrying. But those state court determinations do not compel us to conclude that the "justifiable need" standard, which in New Jersey must be met

to carry openly *or* concealed, fails to qualify as a "longstanding," "presumptively lawful" exception to the Second Amendment guarantee. The "justifiable need" standard fits comfortably within the longstanding tradition of regulating the public carrying of weapons for self-defense. In fact, it does not go as far as some of the historical bans on public carrying; rather, it limits the opportunity for public carrying to those who can demonstrate a justifiable need to do so. See id. at 90 (discussing states that once "banned the carrying of pistols and similar weapons in public, both in a concealed or an open manner") (citing Ch. 96, §§ 1–2, 1881 Ark. Acts at 191–92; Ch. 13, § 1, 1870 Tenn. Acts at 28; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws at 25; Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws, at 352).[9]

A close analogue to the New Jersey standard can be found in New York's permit schema, which has required a

---

[9]   Contrary to the Dissent's suggestion, requiring demonstration of a "justifiable need" prior to issuance of a permit to carry openly or concealed does not amount to "a complete prohibition on public carry." Dissenting Opinion 19. Although the Dissent eventually acknowledges that New Jersey is merely *regulating* public carry, see id. at 24, it takes pains to refer to New Jersey's approach as a "prohibition," referring to New Jersey's schema as "a prohibition against both open and concealed carry *without a permit* . . . ." Id. at 21 (emphasis added). This obfuscates what New Jersey is actually doing. It is *regulating* public carry by imposing an objective standard for issuance of a public carry permit, and its *regulation* is a longstanding, presumptively constitutional one.

showing of need, or "proper cause," for a century. In 1913 New York determined that a reasonable method for addressing the dangers inherent in the carrying of handguns in public was to limit handgun possession in public to those showing "proper cause" for the issuance of a permit. Kachalsky, 701 F.3d at 85 (citing 1913 Laws of N.Y., ch. 608, at 1627-1630). In combination with New York's ban on open carrying, typical New Yorkers desiring to carry a handgun in public must demonstrate "proper cause," just as typical New Jerseyans must demonstrate "justifiable need."[10] As the District Court noted, New York's statute was "adopted in the same era that states began adopting the felon in possession statutes that Heller explicitly recognized as being presumptively lawful longstanding regulations." District Court Opinion 32. The D.C. Circuit in Heller v. District of Columbia, 670 F.3d 1244, 1253 (D.C. Cir. 2011) [Heller II], stated that the Supreme Court "considered 'prohibitions on the possession of firearms by felons' to be 'longstanding' although states did not start to enact them until the early 20th century." Simply put, we need not find that New Jersey and other states, at the time of the adoption of the Bill of Rights, required a particularized showing of objective justification to carry a handgun.[11] Accordingly, New York's adoption of a

---

[10] Here, we use the phrase "typical" to refer to persons in New York and New Jersey who do not fall into any of the statutorily specified categories of persons who may carry a firearm in public without demonstrating "proper cause" or "justifiable need," respectively. Accordingly, the individual plaintiffs in this case are "typical," as they do not fall into any of those specified categories.

[11] In Barton, 633 F.3d at 173, we explained that the "first federal statute disqualifying felons from possessing firearms

"proper cause" standard in 1913, 11 years before New Jersey required that permits be issued only upon a showing of "need," supports our conclusion that New Jersey's "justifiable need" standard may be upheld as a longstanding regulation.[12]

---

was enacted in 1938," adding that "Congress did not bar non-violent felons from possessing guns until 1961." Our sister courts have likewise recognized that a firearms regulation may be "longstanding" and "presumptively lawful" even if it was only first enacted in the 20th century. See National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 700 F.3d 185, 196-97 (5th Cir. 2012) (upholding as a "longstanding" provision a federal statute prohibiting transfer of firearms from federal licensees to individuals under age 21, which Congress did not adopt until 1968); United States v. Skoien, 614 F.3d 638, 640-41 (7th Cir. 2010) (explaining that 18 U.S.C. § 922(g)(4), which forbids firearm possession by a person who has been adjudicated to be mentally ill, was enacted in 1968). "After all, Heller considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid–20th century vintage." National Rifle Ass'n, 700 F.3d at 196.

[12] The Dissent suggests that the longstanding nature of New York's "proper cause" standard cannot support our conclusion that the "justifiable need" standard qualifies as a longstanding regulation. It states that the "Second Circuit . . . upheld New York's law because it survived intermediate scrutiny, not because it evaded Second Amendment cognizance on account of its longstandingness." Dissenting Opinion 26. We agree that this is what the Kachalsky court did, but disagree that its decision to resolve the case solely through intermediate scrutiny requires that we do the same

We discern no hint in the Second Amendment jurisprudence of either the Supreme Court or this Court that the analysis of a particular regulation in a particular jurisdiction should turn entirely on the historical experience of that jurisdiction alone. To the contrary, in <u>Barton</u>, our analysis of the constitutionality of a federal firearm restriction included consideration of the fact that at least seven *state* legislatures "had adopted bans on the carrying of concealed weapons by violent offenders" prior to 1923. 633 F.3d at 173.

Consequently, assuming that the Second Amendment confers upon individuals some right to carry arms outside the home, we would nevertheless conclude that the "justifiable need" standard of the Handgun Permit Law is a longstanding regulation that enjoys presumptive constitutionality under the teachings articulated in <u>Heller</u> and expanded upon in our Court's precedent. Accordingly, it regulates conduct falling outside the scope of the Second Amendment's guarantee.

## VI.

As discussed above, we believe that the "justifiable need" standard of the Handgun Permit Law qualifies as a "longstanding," "presumptively lawful" regulation that regulates conduct falling outside the scope of the Second Amendment's guarantee. Consequently, we need not move to the second step of <u>Marzzarella</u> to apply means-end scrutiny, but we have decided to do so because the constitutional issues presented to us in this new era of Second Amendment jurisprudence are of critical importance. Even assuming that

---

here. We cite to <u>Kachalsky</u> here merely for its description of New York's law and standard.

the "justifiable need" standard is not a longstanding regulation enjoying presumptive constitutionality, at the second step of <u>Marzzarella</u> it withstands the appropriate, intermediate level of scrutiny, and accordingly we would uphold the continued use of the standard on this basis as well.

A.

As a preliminary matter, we reject Appellants' invitation to apply First Amendment prior restraint doctrine rather than traditional means-end scrutiny. Appellants contend that we should apply the First Amendment prior restraint doctrine because application of the Handgun Permit Law's "justifiable need" standard vests licensing officials with "unbridled discretion." Appellants correctly note that this Court has stated that "the structure of First Amendment doctrine should inform our analysis of the Second Amendment." <u>See</u> <u>Marzzarella</u>, 614 F.3d at 89 n.4. This statement, however, reflects this Court's willingness to consider the varying levels of means-end scrutiny applied to First Amendment challenges when determining what level of scrutiny to apply to a Second Amendment challenge. It does not compel us to import the prior restraint doctrine. Indeed, this Court has rejected a similar invitation to import the First Amendment overbreadth doctrine to the Second Amendment context. <u>See</u> <u>Barton</u>, 633 F.3d at 172 n.3.

Even if we were to apply the prior restraint doctrine, it would not compel the result sought by Appellants because New Jersey's Handgun Permit Law does not vest licensing officials with "unbridled discretion." Appellants incorrectly characterize the "justifiable need" standard as a highly discretionary, seat-of-the-pants determination. On the

contrary, the standards to be applied by licensing officials are clear and specific, as they are codified in New Jersey's administrative code and have been explained and applied in numerous New Jersey court opinions. Moreover, they are accompanied by specific procedures[13] that provide "safeguards against arbitrary official action." See Siccardi, 284 A.2d at 539. Accordingly, we conclude that even if we were to apply the prior restraint doctrine, the Handgun Permit Law would survive its application.

### B.

Having determined that it would not be appropriate to import First Amendment prior restraint doctrine to our analysis of Appellants' Second Amendment challenge here, we conclude that the appropriate level of traditional means-end scrutiny to apply would be intermediate scrutiny.

As laws burdening protected conduct under the First Amendment are susceptible to different levels of scrutiny, similarly "the Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue." United States v. Reese, 627 F.3d 792, 801 (10th Cir. 2010) (citing Marzzarella, 614 F.3d at 96-97) (internal quotation marks and alterations omitted).

---

[13] See N.J.S.A. § 2C:58-4(e) (allowing an applicant whose application is denied by the   chief police officer or superintendent to "request a hearing in the Superior Court . . . by filing a written request for such a hearing within 30 days of the denial").

Three levels of scrutiny are potentially available: rational basis review, intermediate scrutiny, and strict scrutiny. Marzzarella, 614 F.3d at 95-99. Under rational basis review, we would "presume[] the law is valid and ask[] only whether the statute is rationally related to a legitimate state interest," id. at 95-96 n.13 (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985)), but Heller makes clear that we may not apply rational basis review to a law that burdens protected Second Amendment conduct, id. at 95-96 (citing Heller, 554 U.S. at 628 n.27). At the other end of the spectrum is strict scrutiny, which demands that the statute be "narrowly tailored to promote a compelling Government interest . . . [;] [i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000) (internal citations omitted). In between is intermediate scrutiny, under which the government's asserted interest must be more than just legitimate but need not be compelling. It must be "significant, substantial, or important." Marzzarella, 614 F.3d at 98 (internal quotation marks and citations omitted). Additionally, "the fit" between the asserted interest and the challenged law need not be "perfect," but it must be "reasonable"[14] and "may not burden more [conduct] than is reasonably necessary." Id.

---

[14] Marzzarella has articulated for this Court that Second Amendment intermediate scrutiny requires a fit that is *reasonable*." See 614 F.3d at 98. We note that the Fourth Circuit also requires a "reasonable" fit, although the Second Circuit requires a "substantial" fit. Compare Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013) (stating that the fit must be "reasonable," but need not be perfect), with

In Marzzarella, this Court applied intermediate
scrutiny to evaluate the constitutionality of a federal law
prohibiting possession of firearms with obliterated serial
numbers. 614 F.3d at 97. Appellants contend that Marzzarella
should not inform our analysis of the appropriate level of
scrutiny to apply here because the law at issue in Marzzarella
"d[id] not severely limit the possession of firearms." See id.
They contend that only strict scrutiny could possibly apply to
the case at bar because the burden imposed by the "justifiable
need" standard "is substantial, implicating the core rights of
responsible, law-abiding citizens to engage in an activity
whose protection is literally enumerated." Appellants' Brief
52. We disagree.

In the First Amendment context, strict scrutiny is
triggered when the government imposes content-based
restrictions on speech in a public forum. See Pleasant Grove
City v. Summum, 555 U.S. 460, 469 (2009). In essence, this
is the core of the First Amendment, just like the core of the
right conferred upon individuals by the Second Amendment
is the right to possess usable handguns *in the home* for self-
defense. See Kachalsky, 701 F.3d at 93 ("[W]e believe that
applying less than strict scrutiny when the regulation does not
burden the 'core' protection of self-defense in the home
makes eminent sense in this context and is in line with the
approach taken by our sister circuits."). We agree with the
District Court, therefore, that strict scrutiny should not apply
here, because "[i]f the Second Amendment protects the right
to carry a handgun outside the home for self-defense at all,

Kachalsky, 701 F.3d at 97 (stating that the fit must be
"substantial" but citing Marzzarella for the standard).

that right is not part of the core of the Amendment." District Court Opinion 39. Accordingly, we will apply intermediate scrutiny here.

### C.

As stated above, under intermediate scrutiny the government must assert a significant, substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary. Marzzarella, 614 F.3d at 98. When reviewing the constitutionality of statutes, courts "accord substantial deference to the [legislature's] predictive judgments." See Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997).

### D.

The State of New Jersey has, undoubtedly, a significant, substantial and important interest in protecting its citizens' safety. See United States v. Salerno, 481 U.S. 739, 745 (1987).[15] The issue here, therefore, is whether there is a "reasonable fit" between this interest in safety and the means chosen by New Jersey to achieve it: the Handgun Permit Law and its "justifiable need" standard.[16]

---

[15] Appellants do not dispute this point.

[16] The Dissent repeatedly states that we do not consider the "justifiable need requirement itself" but rather "examin[e] the permitting requirement as a whole." See, e.g., Dissenting Opinion 29, 36. This is a mischaracterization, to which we respond, *res ipsa loquitur*.

1.

The predictive judgment of New Jersey's legislators is that limiting the issuance of permits to carry a handgun in public to only those who can show a "justifiable need" will further its substantial interest in public safety.[17] New Jersey contends that the "justifiable need" standard "precisely fits New Jersey's interest in assessing the corresponding dangers and risk to the public and to the person seeking to carry a handgun. The [standard] provides a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun." Appellees' Brief 34. To be sure, New Jersey has not presented us with much evidence to show how or why its legislators arrived at this predictive judgment. New Jersey's counsel acknowledges that "there is no available commentary which would clarify whether or not the Legislature considered statistical information to support

---

[17] New Jersey has asserted that the interests served by the Handgun Permit Law and its "justifiable need" standard include "combating handgun violence," "combating the dangers and risks associated with the misuse and accidental use of handguns," and "reduc[ing] the use of handguns in crimes." Appellees' Brief 34. All of these interests fall under the substantial government interest in "ensur[ing] the safety of all of its citizenry." Id. The Dissent improperly narrows the "fit" inquiry to consider only one asserted interest, writing: "we must ask whether the State has justified its conclusion that those with a special need for self-defense are less likely to misuse or accidently use a handgun than those who do not have a special need." Dissenting Opinion 29.

the public safety purpose of the State's Carry Permit Law."
Appellees' February 27, 2013 Letter at 1-2.

New Jersey's inability to muster legislative history
indicating what reports, statistical information, and other
studies its legislature pondered when it concluded that
requiring handgun permit applicants to demonstrate a
"justifiable need" would reasonably further its substantial
public safety interest, notwithstanding the potential burden on
Second Amendment rights, is unsurprising. First, at each
relevant moment in the history of New Jersey gun laws,
spanning from 1905[18] to 1981,[19] the legislature could not have
foreseen that restrictions on carrying a firearm outside the
home could run afoul of a Second Amendment that had not
yet been held to protect an *individual* right to bear arms,
given that the teachings of <u>Heller</u> were not available until that
landmark case was decided in 2008. Moreover, Second
Amendment protections were not incorporated against the
states until 2010, when the Supreme Court issued its
splintered opinion in <u>McDonald</u>. Simply put, New Jersey's
legislators could not have known that they were potentially
burdening protected Second Amendment conduct, and as

---

[18] <u>See</u> <u>Compiled Statutes of New Jersey, Vol. II.</u>, 1759
(Soney & Sage 1911) (reprinting 1905 statute stating "[a]ny
person who shall carry any revolver, pistol, firearm,
bludgeon, blackjack, knuckles, sand-bag, slung-shot or other
deadly, offensive or dangerous weapon, or any stiletto, dagger
or razor or any knife with a blade five inches in length or over
concealed in or about his clothes or person, shall be guilty of
a misdemeanor").

[19] New Jersey's permit schema as it stands today was last
amended in 1981.  N.J. Stat. Ann. § 2C:58-4.

such we refuse to hold that the fit here is not reasonable merely because New Jersey cannot identify a study or tables of crime statistics upon which it based its predictive judgment. As the District Court correctly concluded, New Jersey's legislature "has continually made the reasonable inference that given the obviously dangerous and deadly nature of handguns, requiring a showing of particularized need for a permit to carry one publicly serves the State's interests in public safety." District Court Opinion 42. To require applicants to demonstrate a "justifiable need" is a reasonable implementation of New Jersey's substantial, indeed critical, interest in public safety. See IMS Health, Inc. v. Ayotte, 550 F.3d 42, 55 (1st Cir. 2008) (explaining that under intermediate scrutiny states are "allowed to justify speech restrictions by reference to studies and anecdotes," and also by reference to "history, consensus, and simple common sense") (internal quotation marks omitted), abrogated on other grounds by 131 S. Ct. 2653 (2011).

2.

Legislators in other states, including New York and Maryland, have reached this same predictive judgment and have enacted similar laws as a means to improve public safety. As mentioned above, in 1913 New York enacted a law requiring applicants to demonstrate "proper cause—a special need for self-protection." Kachalsky, 701 F.3d at 84. Maryland law allows issuance of a permit to carry a handgun in public only upon a finding that an applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." Woollard v.

27

Gallagher, 712 F.3d 865 (4th Cir. 2013) (citing Md. Code Ann., Pub. Safety § 5-306(a)(5)(ii)).

In Siccardi, the Supreme Court of New Jersey quoted from a staff report to the National Commission on the Causes and Prevention of Violence by Newton and Zimring, who:

> evaluated the utility of firearms as weapons of defense against crime. They found that private possession of a handgun is rarely an effective means of self-protection; and so far as the carrying of handguns is concerned, they noted that "no data exist which would establish the value of firearms as a defense against attack on the street" though "there is evidence that the ready accessibility of guns contributes significantly to the number of unpremeditated homicides and to the seriousness of many assaults."

Siccardi, 284 A.2d at 537 (citing Newton and Zimring, Firearms and Violence in American Life, p. 67 (1968)).

Although we lack an explicit statement by New Jersey's legislature explaining why it adopted the "justifiable need" standard, its 1978 decision to change "need" to "justifiable need" suggests that the legislature agreed with Siccardi's reasoning and ultimate conclusion. See Siccardi, 284 A.2d at 535 (approving denial of a permit for failure to "*justify* a need for carrying a weapon") (emphasis added). As discussed above in Section I, the executive branch similarly indicated its approval of Siccardi when it defined "justifiable

need" in the Administrative Code by closely tracking the Supreme Court of New Jersey's language. See id. at 540.

3.

We must emphasize that the fit between the challenged law and the interest in public safety need only be "reasonable." As New Jersey correctly notes, the Handgun Permit Law and its "justifiable need" standard provide "a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun." Appellees' Brief 34. By contrast, Appellants contend that enabling qualified, responsible, law abiding people to defend themselves from crime by carrying a handgun, *regardless* of their ability to show a "justifiable need," serves the interest of public safety. New Jersey legislators, however, have made a policy judgment that the state can best protect public safety by allowing only those qualified individuals who can demonstrate a "justifiable need" to carry a handgun to do so. In essence, New Jersey's schema takes into account the individual's right to protect himself from violence as well as the community at large's interest in self-protection. It is New Jersey's judgment that when an individual carries a handgun in public for his or her own defense, he or she necessarily exposes members of the community to a somewhat heightened risk that they will be injured by that handgun. New Jersey has decided that this somewhat heightened risk to the public may be outweighed by the potential safety benefit to an individual with a "justifiable need" to carry a handgun. Furthermore, New Jersey has decided that it can best determine when the individual benefit outweighs the

29

increased risk to the community through careful case-by-case scrutiny of each application, by the police and a court.[20]

Other states have determined that it is unnecessary to conduct the careful, case-by-case scrutiny mandated by New Jersey's gun laws before issuing a permit to publicly carry a handgun. Even accepting that there may be conflicting empirical evidence as to the relationship between public handgun carrying and public safety, this does not suggest, let alone compel, a conclusion that the "fit" between New Jersey's individualized, tailored approach and public safety is not "reasonable."

4.

---

[20] As the Supreme Court of New Jersey has explained:

> So concerned is the [New Jersey] Legislature about this licensing process that it allows only a Superior Court judge to issue a permit, after applicants first obtain approval from their local chief of police. In this (as perhaps in the case of election laws) the Legislature has reposed what is essentially an executive function in the judicial branch. We have acceded to that legislative delegation because "[t]he New Jersey Legislature has long been aware of the dangers inherent in the carrying of handguns and the urgent necessity of their regulation . . . ."

In re Preis, 573 A.2d at 151 (quoting Siccardi, 284 A.2d at 538).

30

As to the requirement that the "justifiable need" standard not burden more conduct than is reasonably necessary, we agree with the District Court that the standard meets this requirement. "Unlike strict scrutiny review, we are not required to ensure that the legislature's chosen means is 'narrowly tailored' or the least restrictive available means to serve the stated governmental interest." Kachalsky, 701 F.3d at 97. New Jersey engages in an individualized consideration of each person's circumstances and his or her objective, rather than subjective, need to carry a handgun in public. This measured approach neither bans public handgun carrying nor allows public carrying by all firearm owners; instead, the New Jersey Legislature left room for public carrying by those citizens who can demonstrate a "justifiable need" to do so.[21] We refuse Appellants' invitation to intrude upon the sound judgment and discretion of the State of New Jersey, and we conclude that the "justifiable need" standard withstands intermediate scrutiny.

---

[21] Although the Dissent acknowledges that the "fit" required need only be "reasonable," in application the Dissent repeatedly demands much more of the "justifiable need" provision than a reasonable fit. For example, the Dissent suggests that New Jersey has failed to show "that the justifiable need requirement is *the provision* that can best determine whether the individual right to keep and bear arms 'outweighs' the increased risk to the community that its members will be injured by handguns." Dissenting Opinion 38 (emphasis added). Of course, this far overstates what must be shown in order for a challenged regulation to survive intermediate scrutiny.

## VII.

We conclude that the District Court correctly determined that the requirement that applicants demonstrate a "justifiable need" to publicly carry a handgun for self-defense qualifies as a "presumptively lawful," "longstanding" regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee. We conclude also that the District Court correctly determined that even if the "justifiable need" standard fails to qualify as such a regulation, it nonetheless withstands intermediate scrutiny and is therefore constitutional. Accordingly, we will affirm the judgment of the District Court.

*Drake v. Filko*, No. 12-1150

HARDIMAN, *Circuit Judge*, dissenting.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms for purposes of self-defense. Two years later, the Court applied the Second Amendment to the States in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). Because I am convinced that New Jersey's law conditioning the issuance of a permit to carry a handgun in public on a showing of "justifiable need" contravenes the Second Amendment, I respectfully dissent.

I

As befits a diverse nation of fifty sovereign States and countless municipalities, gun regulation in the United States resembles a patchwork quilt that largely reflects local custom. Regarding the public carry of firearms, two dichotomies are relevant to this case. First, in many States, laws distinguish between open carry of a handgun—such as in a visibly exposed belt holster—and concealed carry—such as hidden from view under clothing or in a pocket. Thirty-one States currently allow open carry of a handgun without a permit, twelve States (including New Jersey) allow open carry with a permit,[1] and seven States prohibit open carry entirely.[2] By

_____

[1] *See* Conn. Gen. Stat. § 29-35; Ga. Code Ann. § 16-11-126(h); Haw. Rev. Stat. § 134-9(c); Iowa Code Ann. § 724.4(1), (4)(i); Md. Code Ann., Crim. Law § 4-

contrast, four States and parts of Montana allow concealed carry without a permit[3] and forty-four States allow concealed carry with a permit.[4]   One State, Illinois, prohibited public

---

203(a)(1)(i), (b)(2); Mass. Gen. Laws ch. 269, § 10(a)(2); Minn. Stat. § 624.714(1a); N.J. Stat. Ann. § 2C:39-5(b); Okla. Stat. tit. 21, §§ 1289.6, 1290.5(A); Tenn. Code Ann. § 39-17-1351; Utah Code Ann. §§ 53-5-704(1)(c), 76-10-505(1)(b). In California, open carry of a loaded handgun is permitted with a license in rural counties, but prohibited elsewhere.  *See* Cal. Penal Code §§ 25850, 26150(b)(2).

[2] *See* Ark. Code Ann. §§ 5-73-120, 5-73-315; Fla. Stat. § 790.053(1); 720 Ill. Comp. Stat. 5/24-1; N.Y. Penal Law §§ 265.03(3), 400.00(2)(f); R.I. Gen. Laws §§ 11-47-8(a), 11-47-11(a); S.C. Code Ann. §§ 16-23-20(12), 23-31-215; Tex. Penal Code Ann. § 46.035(a).

[3] If one can lawfully possess a handgun, one can lawfully carry it concealed without a permit in Alaska, Arizona, Vermont, and Wyoming.  Nicholas J. Johnson et al., Firearms Law and the Second Amendment 21 (2012). Although Montana requires a permit for concealed carrying of a handgun in cities and towns, concealed carrying of a handgun without a permit is allowed for "a person who is outside the official boundaries of a city or town or the confines of a logging, lumbering, mining, or railroad camp." Mont. Code Ann. § 45-8-317(1)(i); *see id.* §§ 45-8-316(1), 45-8-321.

[4] *See* Ala. Code §§ 13A-11-50, 13A-11-73; Ark. Code Ann. § 5-73-315(a); Cal. Penal Code § 26150; Colo. Rev. Stat. § 18-12-105(2)(c); Conn. Gen. Stat. § 29-35(a); Del.

carry of handguns altogether, but that law was struck down as violative of the Second Amendment by the United States Court of Appeals for the Seventh Circuit in December 2012. *See Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).

The second relevant dichotomy is between "shall-issue" and "may-issue" permitting regimes.  In the forty shall-

---

Code Ann. tit. 11, § 1442; Fla. Stat. § 790.06; Ga. Code Ann. § 16-11-126; Haw. Rev. Stat. § 134-9; Idaho Code Ann. § 18-3302(7); Ind. Code § 35-47-2-1(a); Iowa Code § 724.4(4)(i); Kan. Stat. Ann. § 21-6302(d)(8); Ky. Rev. Stat. Ann. § 527.020(4); La. Rev. Stat. Ann. § 40:1379.3; Me. Rev. Stat. tit. 25, § 2001-A; Md. Code Ann., Crim. Law § 4-203(b)(2); Mass. Gen. Laws ch. 269, § 10(a)(2); Mich. Comp. Laws § 750.227(2); Minn. Stat. § 624.714(1a); Miss. Code Ann. §§ 45-9-101, 97-37-1(1); Mo. Rev. Stat. § 571.030(1), (4); Neb. Rev. Stat. § 28-1202(1)(a), (2); Nev. Rev. Stat. §§ 202.350(1)(d)(3), 202.3657; N.H. Rev. Stat. Ann. § 159:4; N.J. Stat. Ann. § 2C:39-5(b); N.M. Stat. Ann. § 30-7-2(A)(5); N.Y. Penal Law §§ 265.03(3), 400.00(2)(f); N.C. Gen. Stat. § 14-269(a1)(2); N.D. Cent. Code § 62.1-04-02; Ohio Rev. Code Ann. § 2923.12; Okla. Stat. tit. 21, §§ 1290.4, 1290.5; Or. Rev. Stat. §§ 166.250(1)(a), 166.260(1)(h); 18 Pa. Cons. Stat. Ann. § 6106(a)(1); R.I. Gen. Laws § 11-47-8(a); S.C. Code Ann. § 16-23-460(B)(1); S.D. Codified Laws § 22-14-9; Tenn. Code Ann. § 39-17-1351; Tex. Gov't Code Ann. § 411.171 *et seq.*; Utah Code Ann. § 76-10-504; Va. Code Ann. § 18.2-308; Wash. Rev. Code § 9.41.050(1)(a); W. Va. Code § 61-7-3; Wis. Stat. § 941.23(2)(d).

issue States,[5] permitting officials must grant an application for handgun carry permits so long as the applicant satisfies certain objective criteria, such as a background check and completion of a safety course. *See* Nicholas J. Johnson et al., Firearms Law and the Second Amendment 21 (2012).   In

---

[5] *See* Alaska Stat. § 18.65.700; Ark. Code Ann. § 5-73-309; Ariz. Rev. Stat. § 13-3112; Colo. Rev. Stat. § 18-12-203(1); Fla. Stat. § 790.06(2); Ga. Code Ann. § 16-11-129; Idaho Code Ann. § 18-3302(1); Ind. Code § 35-47-2-3; Iowa Code § 724.7(1); Kan. Stat. Ann. § 75-7c03; Ky. Rev. Stat. Ann. § 237.110(4); La. Rev. Stat. Ann. § 40:1379.3(A)(1); Me. Rev. Stat. tit. 25, § 2003(1); Mich. Comp. Laws § 28.425b(7); Minn. Stat. § 624.714(2)(b); Miss. Code Ann. § 45-9-101(6)(c); Mo. Rev. Stat. § 571.101(1); Mont. Code Ann. § 45-8-321(1); Neb. Rev. Stat. § 69-2430(3)(b), 69-2433; Nev. Rev. Stat. § 202.3657(3); N.H. Rev. Stat. Ann. § 159:6(I)(a); N.M. Stat. Ann. § 29-19-4(A); N.C. Gen. Stat. § 14-415.12; N.D. Cent. Code §§ 62.1-04-03(1); Ohio Rev. Code Ann. § 2923.125(D); Okla. Stat. tit. 21, § 1290.12(12); Or. Rev. Stat. § 166.291; 18 Pa. Cons. Stat. Ann. § 6109(e)(1); S.C. Code Ann. § 23-31-215(A)-(C); S.D. Codified Laws § 23-7-7; Tenn. Code Ann. § 39-17-1351; Tex. Gov't Code Ann. § 411.172; Utah Code Ann. § 53-5-704; Va. Code Ann. § 18.2-308.02; Wash. Rev. Code § 9.41.070; W. Va. Code § 61-7-4; Wis. Stat. § 175.60; Wyo. Stat. Ann. § 6-8-104(b).   In addition, Alabama and Connecticut "by statute allow considerable police discretion but, in practice, commonly issue permits to applicants who meet the same standards as in shall-issue states."  Johnson, *supra*, at 21; *see also* Ala. Code § 13A-11-75; Conn. Gen. Stat. § 29-28(a).

these jurisdictions, a general desire for self-defense is sufficient to obtain a handgun.

Eight States, including New Jersey, have may-issue permitting regimes.[6] *See id.* In these States, local authorities have more discretion to decide who may be granted permission to carry a handgun, and the general desire to defend one's self or property is insufficient for the permit to issue. Instead, an applicant must demonstrate "justifiable need,"[7] "proper cause,"[8] or "good and substantial reason"[9] to carry a handgun. Although these standards are phrased differently, they are essentially the same—the applicant must show a special need for self-defense distinguishable from that of the population at large, often through a specific and particularized threat of harm. *See* Maj. Typescript at 5 & n.2 (discussing New Jersey law); *Woollard v. Gallagher*, 712 F.3d 865, 869–70 (4th Cir. 2013) (discussing Maryland law);

---

[6] *See* Cal. Penal Code § 26150; Del. Code Ann. tit. 11, § 1441; Haw. Rev. Stat. § 134-9(a); Mass. Gen. Laws ch. 140, § 131(d); Md. Code Ann., Pub. Safety § 5-306; N.J. Stat. Ann. § 2C:58-4(c); N.Y. Penal Law § 400.00(2)(f); R.I. Gen. Laws § 11-47-11(a).

[7] *E.g.*, N.J. Stat. Ann. § 2C:58-4(c).

[8] *E.g.*, N.Y. Penal Law § 400.00(2)(f).

[9] *E.g.*, Md. Code Ann., Pub. Safety § 5–306(a)(5)(ii).

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 86–87 (2d Cir. 2012) (discussing New York law).[10]

   The relative merits of shall-issue regimes versus may-issue regimes are debatable and it is not the role of the federal courts to determine the wisdom of either.  And but for the doctrine of incorporation, the States would be free to choose whatever policy they desired without federal intervention. Since *McDonald*, however, we find ourselves in a situation akin to that in which the federal courts found themselves after the Supreme Court held that the exclusionary rule applied to the States in *Mapp v. Ohio*, 367 U.S. 643 (1961).  Prior to that decision, many States did not require the exclusion of illegally obtained evidence in recognition of the "grave adverse consequence that exclusion of relevant incriminating evidence always entails (viz., the risk of releasing dangerous criminals into society)."  *Hudson v. Michigan*, 547 U.S. 586, 595 (2006); *see also Elkins v. United States*, 364 U.S. 206, 224–25 (1960) (in the year before *Mapp*, twenty-two States had a full exclusionary rule, four States had a partial exclusionary rule, and twenty-four States had no exclusionary rule).

   As it did with the exclusionary rule, the Supreme Court has applied the Second Amendment to the States, *McDonald*, 130 S. Ct. at 3026, and "the enshrinement of constitutional rights necessarily takes certain policy choices off the table," *Heller*, 554 U.S. at 636.  So the question

---

   [10]   Of the remaining two states—Vermont and Illinois—Vermont issues no permits to carry weapons and public carry is allowed, whereas Illinois prohibited public carry altogether.

presented is not whether New Jersey's justifiable need requirement is a reasonable, let alone a wise, policy choice. Rather, we must decide whether the New Jersey statute violates the Second Amendment.

## II

With few exceptions, New Jersey law prohibits handgun possession in public without a permit. *See* N.J. Stat. Ann. § 2C:39-5(b). In addition to meeting certain age, criminal history, and mental health requirements, an individual seeking a permit must complete a training course, pass a test of the State's laws governing the use of force, provide qualification scores from test firings administered by a certified instructor, and demonstrate a "justifiable need" to carry a handgun. *See id.* § 2C:58-4(c); N.J. Admin. Code § 13:54-2.4. "Justifiable need" is defined as:

> the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun.

N.J. Admin. Code § 13:54-2.4(d)(1). "Generalized fears for personal safety are inadequate, and a need to protect property alone does not suffice." *In re Preis*, 573 A.2d 148, 152 (N.J. 1990).

An application for a handgun carry permit is first made to a police official, who determines whether the applicant meets the statutory requirements. N.J. Stat. Ann. § 2C:58-4(c). Upon approval, the police present the application to a

7

Superior Court judge for independent review of whether the statutory requirements, including "justifiable need," have been met.  *Id.* § 2C:58-4(d).  The Superior Court judge may issue an unrestricted permit, issue a limited-type permit that restricts the types of handguns the applicant may carry and where or for what purposes such handguns may be carried, or deny the application.  *Id.*  If the Superior Court denies an application, the applicant may appeal the decision, *id.* § 2C:58-4(e), but appellate review is highly deferential, *see In re Pantano*, 60 A.3d 507, 510 (N.J. Super. Ct. App. Div. 2013).

Appellants brought suit under 42 U.S.C. § 1983 to challenge New Jersey's justifiable need requirement, arguing that it is incompatible with the Second Amendment.  Each of the individual appellants—a group which included a reserve sheriff's deputy, a civilian FBI employee, an owner of a business that restocks ATM machines and carries large amounts of cash, and a victim of an interstate kidnapping— applied for a handgun carry permit, but were denied for want of justifiable need.[11]

The District Court rejected their challenge in a series of alternative holdings.  *Piszczatoski v. Filko*, 840 F. Supp. 2d 813 (D.N.J. 2012).  First, it ruled that the Second Amendment does not protect a general right to carry a gun for self-defense outside the home.  *See id.* at 820–29.  Second, the Court concluded that even if the law "implicate[d] some narrow right to carry a firearm outside the home," the law is a

---

[11] During the pendency of this litigation, two of the original plaintiffs were granted permits, and thus their cases became moot.

"longstanding" regulation that is presumptively constitutional. *See id.* at 829–31. Finally, it determined that even if the Second Amendment extended outside the home and the law was not longstanding enough to be presumptively constitutional, it would still survive intermediate scrutiny. *See id.* at 831–37.

III

Pursuant to the first prong of the test we established in *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), we must determine whether New Jersey's justifiable need requirement burdens conduct protected by the Second Amendment. New Jersey argues—and the District Court held—that the justifiable need requirement does not burden conduct protected by the Second Amendment because that right has no application beyond the confines of one's home. This view is based on an incorrect reading of *Heller* and *McDonald*, both of which indicate that the Second Amendment extends beyond the home.

First, *Heller* engaged in significant historical analysis on the meaning of the text of the Second Amendment, specifically focusing on the words "keep" and "bear" as codifying distinct rights. *See Heller*, 554 U.S. at 582–84. The Court defined "keep arms" as to "have weapons," *id.* at 582, and to "bear arms" as to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person," *id.* at 584 (citation and alterations omitted). To speak of "bearing" arms solely within one's home not only would conflate "bearing" with "keeping," in derogation of the Court's holding that the verbs codified distinct rights, but also would be awkward usage

9

given the meaning assigned the terms by the Supreme Court.
*See Moore*, 702 F.3d at 936 ("The right to 'bear' as distinct
from the right to 'keep' arms is unlikely to refer to the home.
To speak of 'bearing' arms within one's home would at all
times have been an awkward usage. A right to bear arms thus
implies a right to carry a loaded gun outside the home.").

In addition, the *Heller* Court repeatedly noted that the
Second Amendment protects an inherent right to self-defense,
*see* 554 U.S. at 599 ("self-defense . . . was the *central
component* of the right itself" (emphasis in original)); *id.* at
628 ("[T]he inherent right of self-defense has been central to
the Second Amendment right."), and consistently employed
language referring to a more general right to self-defense than
one confined to the home. For example, the Court described
the Amendment's operative clause—"to keep and bear
arms"—as "guarantee[ing] the individual right to possess and
carry weapons in case of confrontation." *Id.* at 592. The
Court also defined "bear arms" to include being "armed
and ready for offensive or defensive action in a case of conflict
with another person." *Id.* at 584. Obviously, confrontations
and conflicts "are not limited to the home." *Moore*, 702 F.3d
at 936.

Moreover, while the Court noted that "the need for
defense of self, family, and property is *most* acute" in the
home, *Heller*, 554 U.S. at 628 (emphasis added), "that
doesn't mean it is not acute outside the home," *Moore*, 702
F.3d at 935. Instead, it "suggest[s] that some form of the
right applies where that need is not 'most acute.'" *United
States v. Masciandaro*, 638 F.3d 458, 468 (4th Cir. 2011)
(Niemeyer, J., concurring). Were it otherwise, there would be
no need for the modifier "most." This reasoning is consistent
with the Supreme Court's historical understanding of the right

to keep and bear arms as "an individual right protecting against both public and private violence," such as in cases of armed resistance against oppression by the Crown. *Heller*, 554 U.S. at 594; *see also id.* at 592–95.

Furthermore, *Heller* also recognized that the right to bear arms was understood at the founding to "exist not only for self-defense, but also for membership in a militia and for hunting, neither of which is a home-bound activity." *Masciandaro*, 638 F.3d at 468 (Niemeyer, J., concurring) (citing *Heller*, 554 U.S. at 598–99). Likewise, when the Court acknowledged that the Second Amendment right was not unlimited, it listed as presumptively lawful regulations those "laws forbidding the carrying of firearms in *sensitive places such as schools and government buildings*." *Heller*, 554 U.S. at 626 (emphasis added). "If the Second Amendment right were confined to self-defense *in the home*, the Court would not have needed to express a reservation for 'sensitive places' outside of the home." *Masciandaro*, 638 F.3d at 468 (Niemeyer, J., concurring) (emphasis in original).

Most importantly, the *McDonald* Court described the holding in *Heller* as encompassing a general right to self-defense. The very first sentence of *McDonald* states: "Two years ago, in *District of Columbia v. Heller*, we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home." *McDonald*, 130 S. Ct. at 3026 (citation omitted). Describing the holding this way—first establishing the legal principle embodied in the Second Amendment and then explaining how it was applied—demonstrates that the legal principle enunciated in *Heller* is not confined to the facts presented in that case.

Advocates of a home-bound Second Amendment, including New Jersey and the District Court, argue that *Heller*'s recognition of an individual Second Amendment right of self-defense was inextricably tied to the home.  *See* Appellee Br. 15–16; *Piszczatoski*, 840 F. Supp. 2d at 821–22. They cite statements in *Heller* such as the directive that the District of Columbia must allow Heller "to register his handgun and must issue him a license to carry it *in the home*." *Heller*, 554 U.S. at 635 (emphasis added).  Also, they note that *Heller* purposely left unclear the entire universe of Second Amendment law: "And whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*."  *Id.* (emphasis added).  Finally, they cite *Heller*'s statement that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.

These arguments prove too much.  In making these comments regarding the home, the Court was merely applying the Second Amendment to the facts at issue in the case before it.  Heller challenged the District of Columbia's prohibition on guns in the home, not its prohibitions on public carry.  The application of the law to the facts does not vitiate the Court's articulation of the right to keep and bear arms as a general right of self-defense.

Although the majority declines to determine whether the Second Amendment extends outside the home, *see* Maj. Typescript at 12, my view that the Second Amendment extends outside of the home is hardly novel.  Indeed, the only court of appeals to squarely address the issue has so held.  *See Moore*, 702 F.3d at 942 ("The Supreme Court has decided

that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside."). In addition, we and other courts of appeals have acknowledged in dicta that the Second Amendment applies beyond the home. *See Marzzarella*, 614 F.3d at 92 ("At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home. And certainly, to some degree, it must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes." (internal citations and footnote omitted)); *see also Kachalsky*, 701 F.3d at 89 ("Although the Supreme Court's cases applying the Second Amendment have arisen only in connection with prohibitions on the possession of firearms in the home, the Court's analysis suggests . . . that the Amendment must have *some* application in the very different context of the public possession of firearms." (emphasis in original)); *Masciandaro*, 638 F.3d at 467 (Niemeyer, J., concurring).

In light of these precedents, I disagree with the majority's assertion that the Seventh Circuit "may have read *Heller* too broadly" in *Moore*. Maj. Typescript at 11. For as I have explained, other courts, including ours, have read *Heller* the same way. *See Marzzarella*, 614 F.3d at 92; *see also Kachalsky*, 701 F.3d at 89. In addition, the majority does not support its criticism of *Moore* with anything but language from a previous Seventh Circuit case, *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), that warned readers "not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense." *Id.* at 640; *see* Maj. Typescript at 11. Although the majority places its emphasis in that passage

13

on the words "at home," perhaps the better place for emphasis is on the words "one of which," especially considering the *Skoien* court's very next sentence: "What other entitlements the Second Amendment creates . . . were left open." *Skoien*, 614 F.3d at 640.  More importantly, however, it is incongruous for the majority to find it only "possible" to conclude that *Heller* implies a right to bear arms beyond the home when we have previously indicated that such a right "must" exist, at least "to some degree."[12]  *Marzzarella*, 614 F.3d at 92; *see* Maj. Typescript at 10.

In sum, interpreting the Second Amendment to extend outside the home is merely a commonsense application of the legal principle established in *Heller* and reiterated in *McDonald*: that "the Second Amendment protects the right to keep and bear arms for the purpose of self-defense." *McDonald*, 130 S. Ct. at 3026.  Because the need for self-defense naturally exists both outside and inside the home, I would hold that the Second Amendment applies outside the home.

IV

Having concluded that the Second Amendment extends outside the home, I now address the majority's holding that New Jersey's justifiable need requirement does not burden conduct protected by the Second Amendment

---

[12] For the same reasons, the majority's assertion that "it may be more accurate" to discuss whether or not the individual right to bear arms for self-defense purposes "exists," rather than whether it "extends," outside the home conflicts with *Marzzarella*.  *See* Maj. Typescript at 9 n.5.

because it is a longstanding regulation exempt from Second Amendment scrutiny.

In *Heller*, the Supreme Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27. Calling these "presumptively lawful regulatory measures,"[13] the Court also noted that the list was not exhaustive. *Id.* at 627 n.26. As we noted in *Marzzarella*, however, "the approach for identifying these additional restrictions is also unsettled." 614 F.3d at 93. Observing that "*Heller*'s identified exceptions all derived from historical regulations," but acknowledging that "it is not clear that pre-ratification presence is the only avenue to a categorical exception," we concluded that "prudence counsels caution when extending these recognized exceptions to novel regulations unmentioned by *Heller*." *Id.*; *see also United States v. Huet*, 665 F.3d 588, 602 (3d Cir. 2012).

Our hesitance to recognize additional exceptions is unsurprising in light of the fact that by doing so we are determining that a certain regulation is *completely outside the reach* of the Second Amendment, not merely that the regulation is a permissible burden on the Second Amendment

---

[13]   In *Marzzarella*, we interpreted the phrase "presumptively lawful" to mean that "these longstanding limitations are exceptions to the right to bear arms," although we acknowledged that this was not the only reasonable interpretation.  614 F.3d at 91.

right.  *See Marzzarella*, 614 F.3d at 91.   Accordingly, it is
also unsurprising that courts have declined to find that
regulations not mentioned in *Heller* fall within its
"longstandingness" exception without a clear historical
pedigree.  *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d
1244, 1255 (D.C. Cir. 2011) (*Heller II*) (declining to
recognize as longstanding a multitude of District of Columbia
handgun registration requirements, including laws requiring
re-registration after three years and requiring applicants to
demonstrate knowledge about firearms, be fingerprinted and
photographed, take firearms training or safety courses, meet a
vision requirement, and submit to a background check every
six years); *United States v. Chester*, 628 F.3d 673, 681 (4th
Cir. 2010) (declining to recognize as longstanding a law
prohibiting firearm possession by domestic violence
misdemeanants because historical data was inconclusive);
*Marzzarella*, 614 F.3d at 95 (declining to recognize as
longstanding a law prohibiting possession of unmarked
firearms).   And even if some of these courts eventually
uphold the law at issue, they do so by subjecting it to
constitutional scrutiny.  *See, e.g.*, *Marzzarella*, 614 F.3d at
95–101.  By contrast, courts that have upheld laws by virtue
of their longstandingness do so on the basis that the court
"do[es] not have to broaden any of *Heller*'s presumptively
valid categories to find that the conduct alleged . . . is outside
the scope of Second Amendment protection."  *Huet*, 665 F.3d
at 603; *see also United States v. Barton*, 633 F.3d 168, 172
(3d Cir. 2011).

Despite the caution that we and other courts have
counseled, the majority today holds that New Jersey's
justifiable need requirement is a longstanding exception to the
Second Amendment right to bear arms.  It does so mostly on

the basis that some form of need requirement has existed in New Jersey since 1924. *See* Maj. Typescript at 14–15. But the majority's analysis ignores the major changes that New Jersey's law has undergone in the decades since 1924 and also misapprehends the legal standards for deeming a law longstanding such that it is beyond the scope of the Second Amendment. A detailed review of the history of New Jersey's gun laws is necessary to explain my first disagreement with my colleagues. I then turn to their misapprehension of *Heller*'s requirements.

A

In 1905, New Jersey enacted its first general ban on carrying concealed firearms. *Compiled Statutes of New Jersey, Vol. II.* 1759 (Soney & Sage 1911). Although the law contained an exception whereby a local official could grant a permit, there were no standards for issuance.[14] *Id.* In 1924, the New Jersey legislature revised the law to incorporate the word "need" for the first time. As amended, the statute provided that concealed carry permits would be issued only after the issuing officer was "satisfied of the sufficiency of the application, and of the need of such person carrying concealed upon his person, a revolver, pistol, or other firearm." *Cumulative Supplement to the Compiled Statutes of New Jersey, 1911-1924 (Volume I)* 844 (Soney & Sage 1925). Violation of the permitting requirement was a misdemeanor. And critically for our purposes, the permitting requirement applied only to the *concealed* carry of firearms. *Open* carry

---

[14] Several other exceptions existed for certain occupations, as well as carry in one's home or business and carry while hunting.

was still allowed without a permit (and thus without any showing of need). *See State v. Repp*, 324 A.2d 588, 592 (N.J. Super. Ct. App. Div. 1974) (Kole, J.S.C., concurring), *rev'd* 352 A.2d 260 (N.J. 1976) (reviewing history).

In 1966, New Jersey made wholesale revisions to its firearms permit laws.  For the first time, the State extended the permitting requirement to open carry as well as concealed carry.  *See* N.J. Stat. Ann. § 2A:151-41 (1966).  In addition, the 1966 Act eliminated a single permit to carry and replaced it with three distinct types of firearms permits: (1) a permit to purchase, which was required to acquire a pistol or revolver; (2) a firearms purchaser identification card to acquire a rifle or shotgun; and (3) a permit to carry a pistol or revolver.  *See* N.J. Stat. Ann. §§ 2A:151-32–36, 41–45 (1966); *Repp*, 324 A.2d at 592 (Kole, J.S.C., concurring) (reviewing history).  The 1966 Act also made possession of a handgun without a permit a felony.

As for the need requirement, it was first defined in *Siccardi v. State*, 284 A.2d 533 (N.J. 1971).[15]  Although the court acknowledged that "need" was somewhat vague, the court defined it as "an urgent necessity for carrying guns for self-protection."  *Id.* at 540.

In 1979, the law was amended to its current form, using the phrase "justifiable need" rather than merely "need."

---

[15] Prior to *Siccardi*, only two cases had mentioned the need requirement, and neither had ascribed any meaning to it. *See McAndrew v. Mularchuk*, 162 A.2d 820, 827 (N.J. 1960); *State v. Neumann*, 246 A.2d 533, 535 (Monmouth Cnty. Ct. 1968).

*See* N.J. Stat. Ann. § 2C:58-4(c) (1979); *In re Friedman*, 2012 WL 6049075, at *4 (N.J. Super. Ct. App. Div. Dec. 6, 2012) (not precedential) (reviewing history). The New Jersey courts have not ascribed any significance to that change of phrasing, however. *See Doe v. Dover Twp.*, 524 A.2d 469, 470 (N.J. Super. Ct. App. Div. 1987) (noting that the change from "need" to "justifiable need" was "intended basically to restate the repealed statutes which were 'carried forward without substantial change'" (quoting 2 *Final Report of the New Jersey Criminal Law Revision Commission* 370 (1971))).

In 1990, the New Jersey Supreme Court clarified that the "urgent necessity" formulation articulated in *Siccardi* requires applicants to show "specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means" as opposed to "[g]eneralized fears for personal safety" or "a need to protect property alone." *Preis*, 573 A.2d at 152. The "urgent necessity" test laid out in *Siccardi* and clarified in *Preis* remains the law to the present day. *See, e.g.*, *Pantano*, 60 A.3d at 510.

B

One facet of New Jersey's history of firearm regulation is particularly important to the longstandingness inquiry. Until 1966, New Jersey allowed the open carry of firearms without a permit. Only concealed carry without a permit issued upon a showing of need has been banned since 1924. This distinction is significant because courts have long distinguished between these two types of carry, holding that although a State may prohibit the open *or* concealed carry of firearms, it may not ban *both* because a complete prohibition on public carry violates the Second Amendment and

19

analogous state constitutional provisions.  For example, in *State v. Reid*, 1 Ala. 612 (1840), the Supreme Court of Alabama upheld a prohibition on the concealed carrying of "any species of fire arms" but cautioned that the State's ability to regulate firearms was not unlimited: "A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."  *Id.* at 614, 616–17. Relying on *Reid*, the Georgia Supreme Court held that a statute prohibiting the carrying of concealed pistols was unconstitutional insofar as it also "contains a prohibition against bearing arms *openly*."  *Nunn v. State*, 1 Ga. 243, 251 (1846) (emphasis in original).  The Louisiana Supreme Court adopted a similar interpretation in *State v. Chandler*, 5 La. Ann. 489 (1850).  There, the court held that a law prohibiting the carrying of concealed weapons was constitutional because "[i]t interfered with no man's right to carry arms . . . in full open view."  *Id.* at 490 (internal quotation marks omitted). Finally, the Tennessee Supreme Court held that although the State could prohibit concealed carry, it could not prohibit all carrying of weapons.  *Andrews v. State*, 50 Tenn. 165, 180–82, 186–88 (1871).

The United States Supreme Court in *Heller* cited *Nunn*, *Chandler*, and *Andrews* as relevant precedents in determining the historical meaning of the Second Amendment, going so far as to say that the Georgia Supreme Court's opinion in *Nunn* "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause."  *Heller*, 554 U.S. at 612; *see also id.* at 613.  Notably, the Court later described the laws struck down in *Reid*, *Nunn*, and *Andrews* as "laws

[that] have come close to the severe restriction of the District's handgun ban," which was struck down as well. *Id.* at 629.

The crux of these historical precedents, endorsed by the Supreme Court, is that a prohibition against both open and concealed carry without a permit is different in kind, not merely in degree, from a prohibition covering only one type of carry. After all, if a State prohibits only one type of carry without a permit, an opportunity for the free exercise of Second Amendment rights still exists. That opportunity disappears when the prohibition is extended to both forms of carry.

The same logic applies to the 1966 New Jersey law. Prior to that year, New Jersey prohibited only concealed carry without a permit. Accordingly, individuals were able to exercise their Second Amendment rights without first obtaining permission from the State. By enacting a prohibition on open carry without a permit in the 1966 law, New Jersey eliminated that right.

Thus, when the majority identifies 1924 as the operative date for its longstandingness inquiry, it does so in derogation of historical precedents, cited approvingly by the Supreme Court in *Heller*, that draw an important distinction between concealed and open carry. Under these precedents, when New Jersey eliminated the ability of its residents to openly carry arms without a permit in 1966, it was, as a constitutional matter, enacting an entirely new law.

Regardless of whether we use 1924 or 1966 as the operative date, however, the majority misapprehends the legal standards applicable to the longstandingness analysis.

21

Because that analysis demonstrates that New Jersey's justifiable need requirement is not sufficiently grounded in history and tradition even if retroactive to 1924, I would hold that the requirement is not exempt from Second Amendment scrutiny.

## C

As we observed in *Marzzarella*, "*Heller*'s identified exceptions all derived from historical regulations."  614 F.3d at 93.  Therefore, the majority concentrates on *Heller*'s recognition of "prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, as the benchmark against which it compares the justifiable need requirement's pedigree.  Maj. Typescript at 17–18 & n.11.  The majority cites our opinion in *United States v. Barton*, in which we explained that the "first federal statute disqualifying felons from possessing firearms was enacted in 1938" and that "Congress did not bar non-violent felons from possessing guns until 1961."  633 F.3d at 173; *see* Maj. Typescript at 18 n.11.  According to my colleagues, because "a firearms regulation may be 'longstanding' and 'presumptively lawful' even if it was only first enacted in the 20th century," Maj. Typescript at 18 n.11, New Jersey's justifiable need requirement, which, according to their interpretation, has existed since 1924, satisfies the standard.  *But see Heller II*, 670 F.3d at 1260 & n.* (finding that a District of Columbia law prohibiting semi-automatic rifles and large-capacity magazines was not longstanding even though the District had banned such weapons and ammunition since 1932 and Michigan had enacted a similar ban in 1927).

I perceive several problems with the majority's analysis.  First, it ignores the fact that, as we explained in

*Barton*, the federal felon-in-possession laws have historical pedigrees that originated with the founding generation. Immediately after discussing the dates of enactment of the federal felon-in-possession laws, we noted that "[d]ebates from the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions, which were considered 'highly influential' by the Supreme Court in *Heller*, also confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." *Barton*, 633 F.3d at 173 (quoting *Heller*, 554 U.S. at 604) (internal citation omitted); *see also Skoien*, 614 F.3d at 640 ("Many of the states [in the eighteenth century], whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime.").

Although "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue," *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *Heller* requires, at a minimum, that a regulation be rooted in history. Otherwise, there would have been no point for the Court to state that it would "expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us," *Heller*, 554 U.S. at 635, and no reason for the Court to describe the exceptions as "longstanding," *id.* at 626.[16]

---

[16] Even if modern laws alone could satisfy the longstandingness test, there presumably would have to be a strong showing that such laws are common in the states. *Cf. Kennedy v. Louisiana*, 554 U.S. 407, 422–26 (2008) (only six states permitting death penalty for rape of a child shows national consensus *against* it). Today, only eight States have

Perhaps recognizing that some historical support is required, the majority attempts to root New Jersey's justifiable need requirement in history by citing the Second Circuit's decision in *Kachalsky* for the proposition that "[i]n the 19th century, most states enacted laws banning the carrying of concealed weapons, and some states went even further than prohibiting the carrying of concealed weapons banning concealable weapons (subject to certain exceptions) altogether whether carried openly or concealed."  Maj. Typescript at 15 (citing *Kachalsky*, 701 F.3d at 95–96) (alterations and internal quotation marks omitted).   As explained in the previous section, however, laws that banned concealed carry alone have little bearing on laws that now regulate both concealed and open carry.  In addition, the laws that the majority cites which purportedly banned both open and concealed carry altogether actually provide little support. *See* Maj. Typescript at 16 (citing Ch. 96, §§ 1–2, 1881 Ark. Acts at 191–92; Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws, at 352; Ch. 13, § 1, 1870 Tenn. Acts at 28; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws at 25).   The statutes in Arkansas, Texas, and Tennessee were upheld only to the extent that they prohibited weapons that were not "arms" within the meaning of the Second Amendment or their state constitutional analogues (which were defined as the arms of a militiaman or a soldier).  *See*

---

enacted may-issue permitting regimes like New Jersey's, which condition the issuance of a permit on some showing of special need.  By contrast, forty-one States either require no permit at all or have enacted shall-issue permitting schemes for concealed carry.  And over half the States do not require permits for open carry.  *See* Part I, *supra*.

24

*Fife v. State*, 31 Ark. 455, 461 (1876); *Andrews*, 50 Tenn. at 186–87; *English v. State*, 35 Tex. 473, 473 (1871); *see also Kachalsky*, 701 F.3d at 91 n.14.  To the extent that the state laws prohibited the carry of weapons used in war, such as a full-sized pistol or revolver, they were struck down.  *See Wilson v. State*, 33 Ark. 557, 559–60 (1878); *Fife*, 31 Ark. at 461; *Andrews*, 50 Tenn. at 186–88.  As one commentator has noted, "*Heller* stated that bans on concealed carry of firearms are so traditionally recognized that they must be seen as constitutionally permissible. . . .  The same cannot, however, be said about general bans on carrying firearms in public, which prohibit open as well as concealed carrying."  Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1516 (2009) (footnote omitted).

The greatest flaw I perceive in the majority's opinion, however, is that the longstandingness analysis is conducted at too high a level of generality.  Rather than determining whether there is a longstanding tradition of laws that condition the issuance of permits on a showing of a greater need for self-defense than that which exists among the general public, the majority chooses as its reference point laws that have regulated the public carry of firearms.  This is "akin to saying that because the government traditionally could prohibit defamation, it can also prohibit speech criticizing government officials."  *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting).  In the First Amendment context, when determining whether a regulation is longstanding, the Supreme Court has looked to that particular type of regulation, not to a broader general category.  *See Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2736 (2011)

(considering a First Amendment challenge to a ban on sale of violent video games: "California's argument would fare better if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence, but there is none"); *United States v. Stevens*, 130 S. Ct. 1577, 1585 (2010) (considering a First Amendment challenge to a ban on depictions of animal cruelty: "the prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies.  But we are unaware of any similar tradition excluding *depictions* of animal cruelty from 'the freedom of speech' codified in the First Amendment" (citations omitted) (emphasis in original)).  Demonstrating that there has been a longstanding tradition of regulating the public carry of firearms tells us nothing about whether New Jersey's justifiable need requirement itself is longstanding.

Finally, the majority's reference to New York's permitting scheme, which requires a showing of "proper cause" and was enacted in 1911, provides no support for its conclusion that New Jersey's justifiable need requirement qualifies as longstanding for purposes of the Second Amendment.  *See* Maj. Typescript at 16–18.  The Second Circuit in *Kachalsky* upheld New York's law because it survived intermediate scrutiny, not because it evaded Second Amendment cognizance on account of its longstandingness.  In fact, the Second Circuit found that the cited sources— including the Arkansas, Tennessee, Texas, and Wyoming statutes cited by the majority—"do not directly address the specific question before us: Can New York limit handgun licenses to those demonstrating a special need for self-protection?  Unlike the cases and statutes discussed above, New York's proper cause requirement does not operate as a

complete ban on the possession of handguns in public."
*Kachalsky*, 701 F.3d at 91.  As a result, the court declined to
find that the law was a longstanding exception to the Second
Amendment.

D

In light of the foregoing, regardless of whether New
Jersey's justifiable need requirement dates to 1924 or 1966
for purposes of the inquiry, there is not a sufficiently
longstanding tradition of regulations that condition the
issuance of permits on a showing of special need for self-
defense to uphold New Jersey's law on that basis.  As we and
other courts have stated, we must be cautious in recognizing
new exceptions to the Second Amendment.  After all, finding
that a regulation is longstanding insulates it from Second
Amendment scrutiny altogether; it is as good as saying that
individuals do not have a Second Amendment right to engage
in conduct burdened by that regulation.  Accordingly, unless
history and tradition speak clearly, we should hesitate to
recognize new exceptions.  Because there is no such history
and tradition here, I would hold that New Jersey's justifiable
need requirement is not a longstanding regulation immune
from Second Amendment scrutiny.

V

Having concluded that New Jersey's justifiable need
requirement burdens conduct protected by the Second
Amendment, I now turn to *Marzzarella*'s second prong,
which requires us to evaluate the law using some form of
means-end scrutiny.  Although I agree with the majority that
intermediate scrutiny applies, I disagree with its conclusion

27

that New Jersey's justifiable need requirement satisfies that standard.[17]

A

Under intermediate scrutiny, the State must assert a significant, substantial or important interest and there must be a reasonable fit between the asserted interest and the challenged regulation. *Marzzarella*, 614 F.3d at 98. "The regulation need not be the least restrictive means of serving the interest, but may not burden more [conduct] than is reasonably necessary." *Id.* The State bears the burden of establishing both of these requirements. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); *Chester*, 628 F.3d at 683.

Because Appellants rightly acknowledge that New Jersey's interest in public safety is significant, substantial, and important, I turn to the question of "fit." "[S]ince the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require." *Fox*, 492 U.S. at 480. Accordingly, we may consider only the reasons and the evidence proffered by the State in evaluating

---

[17] I agree with my colleagues that First Amendment prior restraint doctrine does not apply in the Second Amendment context. Although "the First Amendment is a useful tool in interpreting the Second Amendment," *Marzzarella*, 614 F.3d at 96 n.15, we have never endorsed a wholesale importation of First Amendment principles into the Second Amendment. For instance, in *Barton* we declined to "recognize an 'overbreadth' doctrine outside the limited context of the First Amendment." 633 F.3d at 172 n.3.

the fit between the challenged law and the State's interest. The sole reason articulated by New Jersey in this case is that the justifiable need requirement is "designed to combat the dangers and risks associated with the misuse and accidental use of handguns." Appellee Br. 34. According to New Jersey, because those risks "are borne not only by the person seeking the permit, but by the citizenry he encounters," limiting permits to carry a handgun to those who can show a justifiable need to do so serves the State's interest in public safety. *Id.*

At the outset, we should emphasize that the justifiable need requirement itself, not the State's permitting law in general, is at issue. The majority apparently disagrees insofar as its opinion focuses on whether permitting schemes in general further an interest in public safety. By doing so, I submit that the majority misapprehends the regulation under review. Appellants take no issue with permits in general or with the other objective requirements that an applicant must satisfy prior to obtaining a handgun carry permit, such as background checks, safety courses, and qualification tests. Rather, the regulation at issue is the requirement to show justifiable need, that is, that the applicant has a special need for self-defense greater than that which exists among the general public. *Preis*, 573 A.2d at 152. Accordingly, our inquiry must focus on that requirement. To be precise, we must ask whether the State has justified its conclusion that those with a special need for self-defense are less likely to misuse or accidentally use a handgun than those who do not have a special need.

Although the State must show only a "reasonable" fit, New Jersey comes nowhere close to making the required showing. Indeed, New Jersey has presented no evidence as to

29

how or why its interest in preventing misuse or accidental use of handguns is furthered by limiting possession to those who can show a greater need for self-defense than the typical citizen.[18]

The majority excuses the State for this evidentiary void by reference to the fact that *Heller* was not decided until 2008 and that the Second Amendment had not been incorporated against the States until 2010. "Simply put," the majority states, "New Jersey's legislators could not have known that they were potentially burdening protected Second Amendment conduct, and as such we refuse to hold that the fit here is not reasonable merely because New Jersey cannot identify a study or tables of crime statistics upon which it based its predictive judgment." Maj. Typescript at 26–27.

Even if one were to ignore the fact that people bore and desired to bear firearms in New Jersey in the decades prior to *Heller*, the lack of legislative history surrounding the State's enactment of the justifiable need requirement is not the chief problem with the State's showing. To be clear, New Jersey has provided *no evidence at all* to support its proffered justification, not just no evidence that the legislature considered at the time the need requirement was enacted or amended. The majority errs in absolving New Jersey of its obligation to show fit. Our role is to evaluate the State's proffered evidence, not to accept reflexively its litigation

---

[18] The majority acknowledges this evidentiary void, *see* Appellees' Feb. 23, 2013 Letter at 1–2, although my colleagues characterize the State's failure too charitably: "To be sure, New Jersey has not presented us with *much* evidence . . . ." Maj. Typescript at 25 (emphasis added).

position.  *See Heller II*, 670 F.3d at 1259 (holding that the government had not borne its burden under intermediate scrutiny because "the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments"); *Chester*, 628 F.3d at 683 (holding that the government had not borne its burden under intermediate scrutiny because "[t]he government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between [18 U.S.C.] § 922(g)(9) and an important governmental goal" (emphasis in original)). "Without pointing to any study, empirical data, or legislative findings," New Jersey submits merely "that the fit [i]s a matter of common sense." *United States v. Carter*, 669 F.3d 411, 419 (4th Cir. 2012).  Under these circumstances, the State has not carried its burden to "affirmatively establish the reasonable fit we require." *Fox*, 492 U.S. at 480; *see, e.g.*, *Carter*, 669 F.3d at 419; *Heller II*, 670 F.3d at 1259; *Chester*, 628 F.3d at 683.

Even were we to deem adequate the State's proffered reasons alone, without any supporting evidence, there still would be no reasonable fit between the justifiable need requirement and the State's interest in "combating the dangers and risks associated with the misuse and accidental use of handguns." Appellee Br. 34.  The fact that one has a greater need for self-defense tells us nothing about whether he is less likely to misuse or accidentally use handguns.  This limitation will neither make it less likely that those who meet the justifiable need requirement will accidentally shoot themselves or others, nor make it less likely that they will

turn to a life of crime.  Put simply, the solution is unrelated to the problem it intends to solve.  Our inquiry here focuses on the *way* New Jersey has sought to address the societal ills of misuse and accidental use (by giving permits only to those who have a greater need for self-defense), not on whether New Jersey has an interest in combating these problems. Limiting permits to those who can show a greater need for self-defense than the public at large does not make it less likely that misuse and accidental use will occur.  In fact, that proposition is counterintuitive.  Misuse and accidental use presuppose the active handling of handguns and it seems odd to suggest that one who obtains a handgun carry permit because he is in imminent danger is less likely to handle a gun than one who obtains a carry permit because he might want to exercise that right in the future even though he perceives no present danger.

An example demonstrates the absence of a fit between the justifiable need requirement and reducing misuse or accidental use of handguns.  Imagine that a 21-year-old with no criminal record is shot in the leg while leaving his home in a high-crime area.  Citing the portion of the justifiable need requirement that allows handgun permit issuance to those who have suffered from previous attacks, he applies for and is granted a permit to carry a handgun.  Unbeknownst to the permitting officials, however, the 21-year-old is a street-level drug dealer who wants the gun to retaliate against the rival who shot him.  It borders on the absurd to believe that this 21-year-old is less likely to misuse or accidentally use a handgun than a reserve sheriff's deputy who wishes to carry a gun for self-defense while off duty, like Appellant Finley Fenton; or a civilian FBI employee who received specific information that a terrorist organization might target him or his family, like

former Appellant Daniel Piszczatoski; or an owner of an ATM restocking company who routinely carries large amounts of cash, like Appellant John Drake.

The counterintuitiveness of the idea that limiting handguns to those who have a special need for self-defense reduces misuse or accidental use is borne out by the experience of other States that issue handgun permits on a shall-issue basis, which is what New Jersey's Handgun Permit Law would look like without the justifiable need requirement.   For example, Florida has issued 2,525,530 handgun carry licenses since 1987.   *Concealed Weapon or Firearm License Summary Report*, http://licgweb.doacs. state.fl.us/stats/cw_monthly.pdf (last visited July 16, 2013). To date, Florida has revoked only 168 licenses—0.00665%— for crimes involving firearms.   *Id.*   In Texas, of the 63,679 criminal convictions (not just those in which firearms were used) in 2011, only 120—0.1884%—were attributed to individuals licensed to carry handguns.   *Conviction Rates for Concealed Handgun License Holders*, http://www.txdps.state.tx.us/ RSD/CHL/Reports/ConvictionRatesReport2011.pdf (last visited July 16, 2013).

In addition, although not all States keep detailed statistics on crimes committed by permit holders, many States keep statistics on permit revocations.   For instance, Michigan issued 87,637 permits for the year ending June 30, 2011, but revoked only 466 of them.   *Concealed Pistol Licensure Annual Report*, http://www.michigan.gov/ documents/msp/2011_CPL_Report_376632_7.pdf (last visited July 16, 2013).   Tennessee issued 94,975 handgun carry permits in 2011, suspended only 896, and revoked just 97.   *Tennessee Handgun Carry Permit Statistics*,

http://www.tn.gov/safety
/stats/DL_Handgun/Handgun/HandgunReport2011Full.pdf
(last visited July 16, 2013).   North Carolina has issued
228,072 permits in the last 15 years but has revoked only
1,203.  *North Carolina Concealed Handgun Permit Statistics
by County*, http://www.ncdoj.gov/CHPStats.aspx (last visited
July 16, 2013).  The reasons for these revocations are unclear,
but even if we assumed that *all* of them were because of
misuse or accidental use of handguns, the rate in Michigan
and North Carolina is 0.5%, and in Tennessee it is 0.1%.

Irrespective of what other States have done, New
Jersey has decided that fewer handguns legally carried in
public means less crime.  And despite its assertion that the
justifiable need requirement is specifically targeted to
reducing misuse and accidental use, it is obvious that the
justifiable need requirement functions as a rationing system
designed to limit the number of handguns carried in New
Jersey.  The New Jersey courts have admitted as much.  *See,
e.g.*, *State v. Valentine*, 307 A.2d 617, 619 (N.J. Super. Ct.
App. Div. 1973) ("[T]he overriding philosophy of our
Legislature is to limit the use of guns as much as possible.");
*see also Siccardi*, 284 A.2d at 540 ("[W]idespread handgun
possession in the streets, somewhat reminiscent of frontier
days, would not be at all in the public interest.").  Even
assuming that New Jersey is correct to conclude that fewer
guns means less crime, a rationing system that burdens the
exercise of a fundamental constitutional right by simply
making that right more difficult to exercise cannot be
considered reasonably adapted to a governmental interest
because it burdens the right too broadly.  *See Ward v. Rock
Against Racism*, 491 U.S. 781, 783 (1989) (under
intermediate scrutiny, the means chosen to achieve the

desired governmental objective may not be "substantially broader than necessary").   The regulation must be more targeted than that to meet intermediate scrutiny.[19]

Those who drafted and ratified the Second Amendment were undoubtedly aware that the right they were establishing carried a risk of misuse, and States have considerable latitude to regulate the exercise of the right in ways that will minimize that risk.  But States may not seek to reduce the danger by curtailing the right itself.  This point is made starker by the fact that the other requirements in New Jersey's permit law display a closer fit with the articulated interest of reducing misuse and accidental use.  For example, New Jersey conducts a criminal background check and requires applicants to complete a training course, pass a test of the State's laws governing the use of force, and provide qualification scores from test firings administered by a certified instructor.  Appellants have challenged none of these regulations.

In sum, New Jersey has not carried its burden to demonstrate that the justifiable need requirement is

---

[19] To be clear, New Jersey need not show that the justifiable need requirement is the least restrictive means of combating the dangers of misuse and accidental use.  Rather, New Jersey fails to meet its burden under intermediate scrutiny both because there is no reasonable fit between the justifiable need requirement and the State's asserted interest in combating misuse and accidental use of handguns, and because New Jersey's desire to ration handgun use too broadly burdens conduct protected by the Second Amendment.

reasonably adapted to its interest in reducing the misuse or accidental use of handguns.  Accordingly, the justifiable need requirement fails intermediate scrutiny and contravenes the Second Amendment.

B

The majority reaches the opposite conclusion by stressing deference to the New Jersey legislature and by declining to examine the justifiable need requirement itself in favor of examining the permitting requirement as a whole. Maj. Typescript at 24 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (*Turner II*)).  Having already addressed the majority's error with respect to the level of generality of its analysis, a few words about deference are in order.

Although the majority is correct that we "'accord substantial deference to the predictive judgments' of the legislature, [New Jersey] is not thereby 'insulated from meaningful judicial review.'"  *Heller II*, 670 F.3d at 1259 (quoting *Turner II*, 520 U.S. at 195, and *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (*Turner I*) (controlling opinion of Kennedy, J.)).  "Rather, we must 'assure that, in formulating its judgments, the legislature has drawn reasonable inferences based on substantial evidence.'"  *Id.* (quoting *Turner II*, 520 U.S. at 195) (alteration omitted).  By deferring absolutely to the New Jersey legislature, the majority abdicates its duty to apply intermediate scrutiny and effectively applies the rational basis test, contrary to the Supreme Court's explicit rejection of that test in the Second Amendment context.  *Heller*, 554 U.S. at 628 n.27.

Such deference is not consistent with intermediate scrutiny because that standard places the burden of establishing both elements of its test—an important interest and a reasonable fit that does not burden more conduct than reasonably necessary—on the State. *See Fox*, 492 U.S. at 480. The majority says that "New Jersey legislators . . . have made a policy judgment that the state can best protect public safety by allowing only those qualified individuals who can demonstrate a 'justifiable need' to carry a handgun to do so," and says that this determination (and others that it notes) lead it to "refuse Appellants' invitation to intrude upon the sound judgment and discretion of the State of New Jersey." Maj. Typescript at 29, 31. Yet the majority never discusses whether those judgments violate the Constitution. It makes no mention of New Jersey's articulated policy interest in reducing the misuse or accidental use of handguns, it says nothing about whether limiting handguns to those who can show a greater need for self-defense is reasonably related to that interest, and it does not adhere to the fact that the State bears the burden of proving the justifiable need requirement's constitutionality.

It is also notable that the majority's version of deference to the New Jersey legislature is akin to engaging in the very type of balancing that the *Heller* Court explicitly rejected. The majority states:

> It is New Jersey's judgment that when an individual carries a handgun in public for his or her own defense, he or she necessarily exposes members of the community to a somewhat heightened risk that they will be injured by that handgun. New Jersey has decided that this somewhat heightened risk to the public may be

> outweighed by the potential safety benefit to an
> individual with a "justifiable need" to carry a
> handgun.

Maj. Typescript at 29.

By deferring to New Jersey's judgment that the justifiable need requirement is the provision that can best determine whether the individual right to keep and bear arms "outweighs" the increased risk to the community that its members will be injured by handguns, the majority employs an "'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller*, 554 U.S. at 634 (quoting *id.* at 689–90 (Breyer, J., dissenting)). The *Heller* Court rejected this sort of balancing inquiry as inconsistent with the very idea of constitutional rights. *Id.* at 634–35.

The majority's failure to analyze the constitutional fit between the justifiable need requirement and New Jersey's articulated interest in reducing the misuse or accidental use of firearms is thus especially troubling. Only by engaging in a true fit analysis are we faithful both to the Supreme Court's rejection of naked interest balancing and to its reminder that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

*          *          *

Gun violence is an intractable problem throughout the United States. In 2011 alone, 6,220 people were murdered by

38

handguns,[20] and although many of the perpetrators of handgun homicides undoubtedly were unlicensed criminals, it is safe to assume that some of the perpetrators were licensed to carry.  New Jersey has sought to protect its citizens by reducing the number of guns carried in public.  In the bygone era when the Bill of Rights acted as a check solely on federal power, New Jersey could regulate guns as it saw fit.  In the post-incorporation era, however, New Jersey must comply with the Second Amendment.

Federal judges must apply the Constitution and the precedents of the Supreme Court regardless of what each judge might believe as a matter of policy or principle.  *See Texas v. Johnson*, 491 U.S. 397, 420–21 (1989) (Kennedy, J., concurring) ("The hard fact is that sometimes we must make decisions we do not like.  We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result.").  No matter how laudable the end, the Supreme Court has long made clear that the Constitution disables the government from employing certain means to prevent, deter, or detect violent crime.  *See, e.g.*, *United States v. Jones*, 132 S. Ct. 945 (2012); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Kyllo v. United States*, 533 U.S. 27 (2001); *Miranda v. Arizona*, 384 U.S. 436 (1966); *Mapp v. Ohio*, 367 U.S. 643 (1961); *see also Heller II*, 670 F.3d at 1296 (Kavanaugh, J., dissenting).  And the Court has been equally clear that the courts must enforce constitutional

---

[20] FBI Uniform Crime Reports, *Crime in the United States 2011*, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/expanded-homicide-data-table-8 (last visited July 16, 2013).

rights even when they have "controversial public safety implications." *McDonald*, 130 S. Ct. at 3045 (controlling opinion of Alito, J.); *see also Heller*, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. . . .   But the enshrinement of constitutional rights necessarily takes certain policy choices off the table."). Because I am convinced that New Jersey's justifiable need requirement unconstitutionally burdens conduct protected by the Second Amendment as interpreted in *Heller* and *McDonald*, I respectfully dissent.